1   HARMEET K. DHILLON, Assistant Attorney General (CABN 207873)
    R. JONAS A. GEISSLER, Deputy Assistant Attorney General (NJBN 025752001)
2   KEVIN J. KIJEWSKI, Deputy Chief (ILARDC 6226876)
    JANE E. ANDERSEN, Trial Attorney (NYRN 4651519)
3   KATHERINE DUTCHER, Trial Attorney (CABN 313010)
    U.S. Department of Justice
4   950 Pennsylvania Ave., N.W.- 4CON
    Washington, DC 20530
5   Telephone: (202) 598-6580
    jane.andersen2@usdoj.gov
6
    CRAIG H. MISSAKIAN, United States Attorney (CABN 125202)
7   PAMELA T. JOHANN, Chief, Civil Division (CABN 145558)
    MICHAEL A. KEOUGH, Assistant United States Attorney (NYRN 5199666)
8   1301 Clay Street, Suite 340S
    Oakland, California 94612-5217
9   Telephone: (510) 637-3721
    Facsimile: (510) 637-3724
10  michael.keough@usdoj.gov

11  Attorneys for Plaintiff United States of America

12                UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14

15  UNITED STATES OF AMERICA,              CASE NO. 3:25-cv-7731

16        Plaintiff,

17        v.                               **COMPLAINT**

18  UBER TECHNOLOGIES, INC.                DEMAND FOR JURY TRIAL

19        Defendant.

20

21                    I.    **INTRODUCTION**

22        1.    Plaintiff United States of America brings this action to enforce Title III of the Americans

23  with Disabilities Act (ADA), 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37,

24  against Defendant Uber Technologies, Inc. (Defendant or Uber).

25        2.    The ADA prohibits private transportation companies from discriminating against people

26  with disabilities.  Uber is the largest provider of demand-responsive[1] transportation in the United States.

27

28        ────────────
        [1] "Demand responsive" transportation is any system of providing transportation by vehicle that is
    not "a fixed route system," 42 U.S.C. § 12181(3), and includes services that involve calling for a car and

                                    1

Uber has also partnered with approximately two dozen local governments to provide publicly funded paratransit services for passengers with disabilities.

3.    As a primary option for demand-responsive transportation, many individuals with disabilities increasingly rely on Uber's services to meet their transportation needs—including to travel to work, medical appointments, religious services, and other important places.

4.    Despite the importance of its services to people with disabilities, Uber denies people with disabilities full and equal enjoyment of its services in several critical ways.

5.    Uber and its drivers routinely refuse to serve individuals with disabilities, including individuals who travel with service animals or who use stowable wheelchairs.

6.    Uber and its drivers also impose impermissible surcharges by charging cleaning fees related to service animals and cancellation fees to riders they have unlawfully denied service.  And Uber's drivers insult and demean people with disabilities or ask them inappropriate questions.

7.    Uber also refuses to reasonably modify its policies, practices, or procedures where necessary to avoid discriminating against riders with disabilities.  Its drivers refuse reasonable requests such as letting passengers with mobility impairments sit in the front seat when necessary.  And its customer service representatives refuse to modify generally applicable policies—such as removing Uber's cap on the number of credits that can be put in rider accounts—so that they can reimburse riders with disabilities for fees they have been improperly charged.

8.    Uber has the ability and obligation to ensure that its drivers do not discriminate against riders with disabilities.

9.    Uber is aware of, but fails to prevent and remedy, disability-based discrimination throughout its transportation services.  Uber does not adequately train its drivers and customer service representatives about their ADA obligations; monitor its drivers to prevent discrimination; or provide meaningful relief to people it has discriminated against.

10.    After the Department notified Uber of its investigation into complaints of widespread disability-based discrimination, Uber instituted a voluntary self-identification feature that allows riders to

---

a driver to take one places, *see* 49 C.F.R. pt. 37, app. D § 37.29.

disclose to a driver that they will be traveling with a service animal.  Notwithstanding this measure, Uber has continued to discriminate against riders who use service animals.

11.    Uber's discriminatory conduct has caused significant economic, emotional, and physical harm to individuals with disabilities.

12.    The United States brings this action based on a reasonable cause determination that Uber has engaged in a pattern or practice of discrimination against people with disabilities.   42 U.S.C. § 12188(b)(1)(B)(i).

13.    The United States also brings this action based on a reasonable cause determination that a person or group of persons has been discriminated against, and that Uber's discrimination raises an issue of general public importance.  42 U.S.C. § 12188(b)(1)(B)(ii).

14.    To redress violations of the ADA by Uber, the harm Uber has caused, and to prevent Uber from continuing to discriminate against people with disabilities, the United States seeks declaratory and injunctive relief, monetary damages, and a civil penalty.

## II.    STATUTORY AND REGULATORY BACKGROUND

15.    Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."   42 U.S.C. § 12101(b)(1).

16.    In passing the ADA, Congress identified that "the Nation's proper goals" include providing people with disabilities "equality of opportunity, full participation, independent living, and economic self-sufficiency" in all aspects of American society.  *Id.* § 12101(a)(7).

17.    Congress also found that "individuals with disabilities continually encounter various forms of discrimination" in "critical areas" including "transportation."  *Id.* § 12101(a)(3) and (5).

18.    The ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce."  *Id.* § 12184(a); 49 C.F.R. § 37.5.

19.    The ADA requires private entities, including Uber, to comply with specific obligations when providing transportation services to individuals with disabilities, by:

(a) Providing individuals with disabilities the opportunity to use the entity's transportation service, if they are capable of using that service, 49 C.F.R. §§ 37.5(b), 37.29(c); *see also* 42 U.S.C. § 12184(b)(1), (2);

(b) Permitting service animals to accompany individuals with disabilities in vehicles, 49 C.F.R. § 37.167(d); *see also* 42 U.S.C. § 12184(a);

(c) Providing equal service to individuals with disabilities, including assistance with stowing mobility devices when needed, 49 C.F.R. § 37.29(c); *see also* 42 U.S.C. § 12184(a);

(d) Providing equal service to individuals with disabilities even if their appearance or involuntary behavior may offend, annoy, or inconvenience others, 49 C.F.R. § 37.5(h); *see also* 42 U.S.C. § 12184(a);

(e) Not imposing surcharges or other disability-related charges on passengers with disabilities, 49 C.F.R. §§ 37.5(d), 37.29(c); *see also* 42 U.S.C. § 12184(a) and 28 C.F.R. § 36.301(c) (incorporated by 49 C.F.R. § 37.5(f));

(f) Ensuring that personnel are trained to proficiency, as appropriate to their duties, so that they can properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, 49 C.F.R. § 37.173; *see also* 42 U.S.C. § 12184(a);

(g) Adopting complaint procedures that provide for the prompt and equitable resolution of complaints alleging disability discrimination, including prompt communication of the entity's response and reasoning for its response to each complainant, 49 C.F.R. § 37.17(b); *see also* 42 U.S.C. § 12184(a); and

(h) Reasonably modifying policies, practices, or procedures when necessary to avoid discriminating against individuals with disabilities unless an entity can show that making such modifications would fundamentally alter the nature of its transportation services, 42 U.S.C. § 12184(b)(2)(A); 49 C.F.R. § 37.5(f); *see also* 42 U.S.C. § 12184(a) and 28 C.F.R. § 36.302 (incorporated by reference in 49 C.F.R. § 37.5(f)).

III.     PARTIES

20.     Plaintiff is the United States of America.

21.     Defendant Uber is a Delaware corporation with its principal place of business at 1725 3rd Street, San Francisco, California, 94158.  Uber is a for-profit company that provides public transportation services in all 50 states in the United States, and in Puerto Rico and Washington, D.C.

22.     Uber refers to Uber Technologies, Inc. and any of its subsidiary companies or operationally distinct segments that are responsible for Uber's provision of transportation services.  *See* 49 C.F.R. § 37.37(f) (nondiscrimination requirements apply to any subsidiary company or operationally distinct segment of a parent company that is primarily engaged in the provision of transportation services).

23.     Uber provides "specified public transportation services," which the ADA defines as "transportation by . . . any [] conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis."  42 U.S.C. § 12181(10); *see also* 49 C.F.R. § 37.3.

24.     Uber is a private entity primarily engaged in the business of transporting people, and its operations affect commerce.  *See* 42 U.S.C. §§ 12181(1), (6), 12184(a) and 49 C.F.R. § 37.3.

25.     Uber is a private entity that provides taxi services, i.e., transportation services that involve calling for a car and a driver to take one places.  *See* 49 C.F.R. § 37.29; *see also id.* pt. 37, app. D § 37.29.

IV.     JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT

26.     This Court has jurisdiction over this action under the ADA, 42 U.S.C. § 12188(b)(1)(B) and 28 U.S.C. §§ 1331 and 1345, because it involves claims arising under federal law and is commenced by the United States.

27.     The Court may grant declaratory relief and other necessary or proper relief pursuant to 28 U.S.C. §§ 2201 and 2202, and may grant equitable relief, monetary damages, and a civil penalty pursuant to 42 U.S.C. § 12188(b)(2).

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the United States' claims occurred in this district and because Uber is deemed to reside in this district.

29.     Divisional assignment to the San Francisco or Oakland Division is proper under Civil L.R. 3-2(c) because Uber is headquartered in San Francisco, and a substantial part of the events or omissions that give rise to the claims occurred in San Francisco.

### V.     **FACTUAL ALLEGATIONS**

30.     Uber provides demand-responsive transportation services, meaning passengers request a car and driver to take them places using Uber's mobile software application (app) and Uber arranges rides between passengers and a fleet of drivers approved by Uber.

31.     Uber operates a transportation system that connects drivers with riders.

32.     Uber determines the towns, cities, and regions in which it operates its transportation services.

33.     Uber assesses the needs of current and potential riders and offers services based on those needs, including UberX, Uber Pet, Uber Comfort, and UberXL.

34.     Uber controls each trip by setting and enforcing, among other things: vehicle specifications; driver training requirements, qualifications, and incentive programs; driver behavior expectations; location tracking; the general ride experience for each trip; and the pricing structure for each trip, including when fees may be charged for cleaning or ride cancellations.

35.     For example, drivers must drive a four-door vehicle while driving for Uber.

36.     To be eligible to drive for Uber Comfort, drivers must have completed at least 100 trips, maintain a minimum driver rating of 4.85, and drive a newer model vehicle approved by Uber.

37.     Uber assesses and meets demand for its transportation services by, among other things, using algorithms to match passengers with drivers and by offering surge pricing to account for high demand.

38.     Uber provides support to its drivers, including by telephone, on video, and in person at Uber Greenlight Hubs in select cities.

39.     Uber limits the hours its drivers can drive consecutively for the safety of its drivers and riders and to comply with local laws.

40.     Uber maintains commercial insurance coverage on behalf of its drivers when driving for Uber.

41. Uber sets rates and fees that determine how much it will pay drivers for each trip, including minimum fares, rates for the mileage and time it takes to drive from the pick-up point to the destination, surcharges, and marketplace fees.

42. Uber permits riders to report driver misconduct and to rate driver performance.

43. Uber sometimes enforces its community guidelines by, among other things, investigating complaints of violations and temporarily or permanently banning drivers and riders from Uber's services when its community guidelines or the law have been violated.

44. Uber is engaging in a pattern or practice of discrimination by failing to provide full and equal enjoyment of its transportation services to people with disabilities in violation of 42 U.S.C. § 12184; and 49 C.F.R. pt. 37.

45. Uber discriminates against a person or group of persons on the basis of disability in violation of 42 U.S.C. § 12188(b)(1)(B)(ii) and 28 C.F.R. § 36.503 and such discrimination raises an issue of general public importance. *See also* 42 U.S.C. § 12101(a)(3) and (5), (b)(1).

46. All the individuals with disabilities whose experiences are described below, as well as all other similarly situated individuals against whom Uber has discriminated based on disability, are aggrieved persons within the meaning of 42 U.S.C. § 12188(b)(2)(B) and 28 C.F.R. § 36.503 and have or may have suffered injuries as a result of its conduct alleged below.

**A.    Uber's Denial of Service to Individuals with Disabilities**

47. Uber denies service to hundreds, and potentially even thousands, of individuals with disabilities who travel with service animals, who use wheelchairs or other mobility devices, or whose appearance or involuntary behavior because of their disabilities may offend, annoy, or inconvenience drivers.

48. Uber receives thousands of complaints each year alleging disability-based discrimination by Uber.

49. Uber's discriminatory denials of service have harmed Michael May, Ryan Dour, Mary Wilson, Linda MacLeod, Julie Tamez, Valerie Hyatt, Jason Ludwig, Olivia Norman, Teresa Speck, Ryan Honick, J.E., Kingsley Joseph, Vincent Coleman, Jeff Clark, Frank Coon, Elizabeth Lawrence, and

Kristen Ingalz—all of whom are people with disabilities as defined by the ADA—as well as many other similarly situated individuals with disabilities who have used Uber's services.

**Michael May**

50.    Michael May lives in Reno, Nevada.  Mr. May is blind and uses a cane and a guide dog for mobility.

51.    Mr. May uses Uber multiple times a week and experiences frequent ride denials because of his guide dog.

52.    Mr. May used to attempt to persuade drivers who told him they would not transport him because of his guide dog to provide him service, but this led to too much confrontation and anxiety.  Now, he notifies drivers in advance that he is traveling with a service animal.

53.    Once, while traveling in Honolulu, Hawaii in or about July and August 2024, Uber denied Mr. May rides several times.

54.    One driver in Honolulu refused to transport Mr. May's service dog and said he did not care if Uber suspended him from its platform as a result.

55.    Mr. May notified another driver in Honolulu in advance that he would be traveling with his service dog.  Before arriving at Mr. May's location, the driver stopped but did not cancel the ride, which prevented Mr. May from requesting a new ride.

56.    While traveling in San Francisco in September 2024, Mr. May waited for an Uber with his service dog outside the entrance of his hotel.  Below is a screenshot from a video of Mr. May's guide dog waiting with him outside the hotel for the Uber to arrive.



57.    The driver approached the hotel entrance and stopped his vehicle as Mr. May crossed in front of the Uber with his guide dog.  Below are screenshots showing the Uber arriving at the hotel and stopping a few feet from the hotel entrance as Mr. May and his guide dog crossed in front of the vehicle.

 

58.    The driver then drove past the entrance without stopping and seconds later Mr. May received a notification that the driver had canceled the ride.  Below are screenshots of the Uber driver leaving the pickup location.

 

59.    Several drivers have told Mr. May that he should use Uber Pet to travel with his service dog.

60.    On some occasions, drivers have agreed to transport Mr. May's service dog only after Mr. May confronted them.

61.    Uber's discrimination and Mr. May's interactions with drivers who are reluctant or unwilling to take his service dog cause him anxiety, emotional distress, and make him feel degraded.

62.    Due to delays caused by Uber's ride denials, Mr. May has felt anxious that he will be late for flights.  Uber's ride denials have caused Mr. May to arrive late for work meetings.  Mr. May feels this reflects poorly on him professionally.

63.    Mr. May has filed numerous complaints with Uber regarding its ride denials, which cost him time.  Uber does not tell him the results of its investigation, and the filing of complaints has not stopped continued discrimination.

**Ryan Dour**

64.    Ryan Dour lives in San Francisco, California.  Mr. Dour is blind and uses a guide dog for navigation.

65.    Mr. Dour has experienced frequent discrimination while using Uber because of his guide dog.  As a result, he avoids using Uber as much as possible.

66.    When traveling within San Franciso, Mr. Dour often relies on alternative private transportation that costs more money than Uber or will use mass transit.  But his options are more limited when he is traveling outside of San Francisco.

67.    When he is required to use Uber, he typically adds an additional 30 minutes to his expected travel time to account for the likelihood of being denied rides by Uber because of his guide dog.

68.    One of his many incidents of being denied a ride by Uber because of his guide dog is illustrated in the six screenshots below.

69.    In the first two screenshots below, Mr. Dour can be seen standing at the curb of the pickup spot as his Uber driver approaches in a black vehicle.



70.     In the third screenshot below, the Uber driver is approaching with his window up.  In the fourth screenshot below, the Uber is stopped across the street from Mr. Dour now with his window down.

 

71.     Mr. Dour had called out the Uber driver's name, prompting the driver to roll down his window.  The driver acknowledged Mr. Dour, looking directly at Mr. Dour and his guide dog.

72.     Seconds later, the Uber drives away, as can be seen in the fifth and sixth screenshots below.

 

73.     While Mr. Dour has filed complaints with Uber when he is discriminated against, he finds it upsetting that Uber refuses to tell him the results of its investigation when he files a complaint about a

1  service animal denial.  Mr. Dour wants to know if Uber is enforcing its policy and believes it is important

2  that he be given an opportunity to counter any claims the driver may make.

3      74.    While Uber will sometimes add a credit to his account when he reports a ride denial because

4  of his service animal, he believes this is inadequate compensation and does not solve the violation of his

5  civil rights.

6      75.    Ride denials because of his guide dog have caused Mr. Dour to be late to meetings and

7  appointments.  Even when Mr. Dour is provided a ride, he experiences stress when he must advocate for

8  himself and convince the driver to take him.

9      76.    When Mr. Dour chooses to use Uber, he feels anxiety preparing for the possibility of a

10  denial.

11  **Mary Wilson**

12      77.    Mary Wilson lives in Alexandria, Virginia.  Ms. Wilson is blind and uses a guide dog for

13  navigation.

14      78.    Ms. Wilson's guide dog wears a harness with the words "guide dog" written in large letters

15  on the handle.

16      79.    Ms. Wilson generally notifies Uber drivers in advance that she is blind with a service

17  animal so that if a driver refuses to transport guide dogs, they can cancel the ride before reaching Ms.

18  Wilson's pickup location, which saves her time.

19      80.    In January 2023, Ms. Wilson and her boyfriend, who is legally blind and uses a cane for

20  navigation, requested an Uber in Washington, D.C. to transport them home after having dinner at a friend's

21  house.

22      81.    The Uber driver arrived and said he would not transport them because of Ms. Wilson's

23  guide dog.

24      82.    Ms. Wilson explained her rights and Uber's policies to the driver.  The driver responded

25  that he did not care and that he would not have the dog in his car.

26      83.    Ms. Wilson called the police.  When the police arrived, they encouraged the driver to

27  transport Ms. Wilson's guide dog.

28      84.    It took at least 45 minutes to convince the driver to transport Ms. Wilson's guide dog.

85.    By the time the driver agreed to complete the ride, Ms. Wilson was extremely frustrated, anxious, and felt unsafe.  She would not have gotten in the car if her boyfriend were not with her.

86.    Uber drivers have also denied Ms. Wilson rides due to her service dog while on business trips.  She has felt humiliated to experience ride denials in a professional setting in front of her colleagues.

87.    Ms. Wilson has been forced to wait in inclement weather due to Uber's ride denials.  When Ms. Wilson's dog has been waiting in the rain due to a ride denial, it is harder for the next driver to take him.

88.    For crucial appointments or if it is raining or very hot, Ms. Wilson will sometimes travel without her guide dog to avoid ride denials.  She experiences fewer ride denials when traveling without her guide dog.

89.    Because of Uber's discrimination, Ms. Wilson has questioned whether she should stop using a guide dog in the future.

90.    When traveling without her guide dog, Ms. Wilson uses a cane for navigation, which is more difficult and time-consuming and causes her great anxiety.

91.    Ms. Wilson uses Uber less frequently than in the past because the ride denials cause her so much anxiety and make her feel dehumanized.  Uber's ride denials make Ms. Wilson feel that she is being rejected because of her disability.  This causes Ms. Wilson to feel depressed because she has worked hard to adapt to her disability.

92.    Uber's ride denials have also resulted in higher costs for Ms. Wilson.  When a driver cancels a ride due to Ms. Wilson's guide dog, Ms. Wilson must request a new Uber, which sometimes has a higher price.  She has also paid more for taxis or private drivers to avoid Uber's ride denials.

93.    Uber has also charged Ms. Wilson cancellation fees when drivers deny service, which fees take time to contest.

**Linda MacLeod**

94.    Linda MacLeod lives in San Jose, California.  Ms. MacLeod is blind and has moderate to severe hearing loss and wears hearing aids.  Ms. MacLeod uses a cane or a service dog for navigation.

95.    In November 2023, Ms. MacLeod requested an Uber to transport her to a hair salon.

96.    Ms. MacLeod waited with her service dog in her driveway.  She notified the Uber driver in advance that she is blind and has a service animal.

97.    When the Uber driver arrived, Ms. MacLeod approached the car to open the door.  The driver then told Ms. MacLeod that he could not take a dog.

98.    Ms. MacLeod informed the driver that it was her service dog, that she is blind, and that the driver was legally required to transport them.

99.    The driver argued that the dog was a pet and again said that he would not take the dog in his car.

100.    Ms. MacLeod insisted to the driver that he was required to transport her.  The driver refused and then drove away.

101.    A second driver was assigned by Uber for the same ride.  Ms. MacLeod notified the second driver in advance that she is blind and has a service animal.

102.    After a few minutes of sending this notification, the driver canceled the ride.  Uber then assigned a third driver.

103.    When the third Uber driver arrived, the driver got out of the car and told Ms. MacLeod that he could not take her dog.

104.    Ms. MacLeod explained that she is blind, that her dog was her service animal, not a pet, and that the driver was required to transport them.

105.    The driver told Ms. MacLeod to use Uber Pet.

106.    Ms. MacLeod pleaded with the driver.

107.    The driver then drove away.  By that time, it was dark outside.  Ms. MacLeod was still speaking when the driver drove off and she initially did not realize he had left.

108.    As a result of Uber's discrimination, Ms. MacLeod missed her hair salon appointment.

109.    Even though Ms. MacLeod filed a complaint with Uber, all three drivers continued to drive for Uber.

110.    She has been reluctant to use Uber due to the inconvenience and emotional stress caused by the possibility of being abandoned or denied another Uber ride.

111.   In March 2025, Ms. MacLeod traveled to Washington, D.C. for an American Council of the Blind leadership conference at which Uber was a sponsor.

112.   As part of its sponsorship of the conference, Uber offered a $25 Uber voucher to attendees.

113.   Ms. MacLeod requested an Uber to transport her and her service dog from the conference to her hotel.

114.   The Uber arrived across the street from Ms. MacLeod, and a conference volunteer went to notify the driver of Ms. MacLeod's location.

115.   The volunteer returned and told Ms. MacLeod the driver refused to transport Ms. MacLeod's service dog.

116.   With the assistance of the volunteer, Ms. MacLeod went to speak to the driver.  Ms. MacLeod told the driver it was unlawful for him to refuse service because of her service dog, that her service dog is not a pet, and that she is blind.

117.   The driver was belligerent and insisted he would not transport Ms. MacLeod.  The driver then drove away, and Ms. MacLeod ultimately traveled to her hotel by taxi.

118.   The Uber driver did not cancel the ride on the Uber app.  Ms. MacLeod therefore canceled the ride and was charged a $5 cancellation fee.

**Julie Tamez**

119.   Julie Tamez lives in Garland, Texas.  Ms. Tamez is blind and uses a guide dog for navigation.

120.   In August 2022, Ms. Tamez requested an Uber after an outing with a friend.

121.   When the Uber driver arrived, Ms. Tamez and her guide dog began to enter the car.

122.   As they were entering the car, the driver said he did not allow dogs.

123.   After Ms. Tamez explained that her dog is a service animal, the driver responded that he was not allowing any dog in his car and, using an expletive, told her to get her dog out of the car.

124.   The Uber driver then drove away while Ms. Tamez and her guide dog still were partially in the car, putting them both in physical danger.

125.   Uber's drivers have denied service to Ms. Tamez on many other occasions because she uses a service animal.

126.     Once, Ms. Tamez experienced four denials in a row from Uber drivers before a fifth driver agreed to transport her.

127.     Ms. Tamez has been forced to take leave from work because Uber drivers have denied her rides.

128.     Several times, Ms. Tamez has been denied rides when it was hot in Texas, when she and her guide dog have been forced to wait for extended periods, sometimes when the temperature was over 110 degrees.

129.     Drivers have also asked her to muzzle her guide dog or to place her in the trunk.

130.     Ms. Tamez retired her prior service animal in May 2023 and traveled without a service animal until April 2025, when she got a new guide dog.  During the time she was without a guide dog, Ms. Tamez never had an Uber driver arrive at her pickup location and then deny her service.

131.     Since traveling with a new service animal since April 2025, she has had at least 12 Uber drivers deny her a ride because of her service animal.

132.     In addition to ride denials, Ms. Tamez has experienced unequal treatment from drivers because of her service animals.  For example, in May 2025, Ms. Tamez called an Uber to take her to a doctor's appointment.  The driver yelled the entire drive telling Ms. Tamez that it was "unfair" he must transport her.

133.     As a result of Uber's discrimination, Ms. Tamez often feels unsafe when requesting a ride with Uber because she is unsure of how drivers will react to her service animal and is aware that drivers who are picking her up or dropping her off at her home, as is usually the case, will know where she lives.

**Valerie Hyatt**

134.     Valerie Hyatt lives in Johnston, Iowa.  Ms. Hyatt is legally deaf blind.  She has very little peripheral vision and uses a guide dog for navigation and hearing aids.

135.     In November 2022, Ms. Hyatt requested an Uber from a local pharmacy to drive her home.

136.     Two drivers canceled after she notified them in advance that she uses a service animal.

137.     On her third request, she did not notify the Uber driver in advance about her service animal and was re-matched with an Uber driver who had just canceled her ride.

138.     When the Uber driver arrived, Ms. Hyatt got into the vehicle with her guide dog.

16

139.    When the driver realized Ms. Hyatt had a service animal—which he apparently had not noticed when he pulled up—he got out of the car and demanded Ms. Hyatt and her service animal exit the vehicle, calling her service animal "filthy."

140.    The driver insisted that he was not required to take dogs despite Ms. Hyatt explaining that he was legally obligated to transport service animals.

141.    When Ms. Hyatt suggested she would call the police, the driver finally agreed to transport her with her service animal.

142.    During the ride, the driver engaged in behavior that made Ms. Hyatt feel scared, emotionally distressed, and upset, including taking an indirect route home, pulling into a parking lot that was not on her way home, playing music so loudly that it hurt her ears, and threatening to report her to Uber.

143.    When Ms. Hyatt filed a complaint with Uber regarding the November 2022 incident, an Uber customer service representative gave Ms. Hyatt a $5 credit and told her that Uber would block the driver from being matched with her again.

144.    Ms. Hyatt believes Uber's response to her complaint benefited the driver more than it did her.

145.    Ms. Hyatt has been denied Uber rides because of her service animal on multiple other occasions.  For example, in October 2024, Ms. Hyatt used Uber about 19 times and was denied rides at least four of those times after the driver learned she was traveling with a service animal.

146.    Because Uber's drivers regularly deny her service, Ms. Hyatt budgets extra time for each ride to try to ensure that the process of finding an Uber driver who will take her does not make her late or cause her to miss appointments.

147.    Additionally, Ms. Hyatt has been regularly accused by Uber's drivers of lying about her disabilities.  Uber drivers have remarked that it seems like Ms. Hyatt can see or that she does not need to use a service dog.

**Jason Ludwig**

148.    Jason Ludwig is a U.S. veteran and lives in Yarmouth Port, Massachusetts.  Mr. Ludwig experiences chronic pain caused by nerve damage sustained to his back and legs while serving in the U.S.

military during the Gulf War. Mr. Ludwig's disability affects his balance and ability to stand for more than five to ten minutes. Since 2019, Mr. Ludwig has relied on a service dog to, among other things, assist with daily living skills, ambulate, and manage his pain.

149.    In May 2023, while traveling in Virginia, Mr. Ludwig requested an Uber to take him and his wife from Newport News, Virginia, to the airport in Norfolk, Virginia.

150.    Mr. Ludwig was traveling with his service animal, which was wearing a service animal vest at the time.

151.    When the Uber driver arrived, the driver rolled down his window and said he would not take dogs.

152.    Mr. Ludwig explained that his dog is a service animal, but the driver still refused to transport Mr. Ludwig with his service animal and drove away.

153.    After expending time trying to persuade the driver to transport him, Mr. Ludwig requested another Uber but was not promptly connected with a new driver.

154.    As a result, Mr. Ludwig and his wife were forced to seek alternative transportation but, by the time they secured it, they were too late to catch their flight home.

155.    Instead, Mr. Ludwig and his wife had to rent a car and drive 16 hours back home to Massachusetts.

156.    The long drive caused Mr. Ludwig's chronic pain to intensify so much that when he finally arrived home he could not walk or stand. He spent most of the following five days in bed and was unable to work.

157.    In addition to his physical pain and suffering, Mr. Ludwig spent more than $1,000 on the airfare for his missed flight and the cost of the rental car.

158.    After the incident, Mr. Ludwig filed a complaint with Uber and was ultimately offered a $15 credit on his account.

159.    Mr. Ludwig found the offer of a $15 credit insulting after his humiliating and financially costly experience.

160.    Mr. Ludwig now avoids using Uber because of the risk he will be denied service because of his service animal.

161.    He instead rents cars when traveling in areas where he cannot use his personal vehicle. This can be less convenient, especially in remote areas with fewer rental facilities.

**Olivia Norman**

162.    Olivia Norman lives in Washington, D.C.  Ms. Norman is blind and uses a service dog for navigation.  Ms. Norman also has cancer and an anxiety disorder.

163.    Ms. Norman uses Uber to commute to work and for other transportation needs.

164.    Ms. Norman has frequently been denied Uber rides after the Uber driver learned she was traveling with her service animal.

165.    In July 2025, she requested an Uber to pick her up at her home.  The Uber driver pulled up across the street.  She started to cross the street and the driver said the dog is too big and drove away.

166.    One time, in 2023, while waiting for an Uber near her home, the driver pulled up and yelled that she was not an Uber Pet.  The driver refused to transport Ms. Norman's service dog.

167.    Even when Ms. Norman is provided service, she experiences discrimination in other ways.

168.    In August 2025, Ms. Norman requested an Uber to pick her up at her home.  The driver arrived and asked about her dog.  Ms. Norman stated it was a guide dog, and the driver stated that Ms. Norman had not ordered Uber Pet.  This required Ms. Norman to advocate for herself and educate the driver.  While the driver relented, this experience caused Ms. Norman great anxiety.

169.    After one Uber trip in 2021 with her service dog, Ms. Norman was charged a cleaning fee.

170.    She felt the driver had been kind to her and was humiliated to learn she had been charged a fee for her service dog.

171.    As a result of the discrimination she has faced while using Uber, she has hired private drivers which costs her more money, but is more reliable.  She did this often when she was in treatment for cancer because did not want to risk being left standing outside for long periods of time.

**Teresa Speck**

172.    Teresa Speck lives in Highland Village, Texas.  Ms. Speck has low vision, color blindness, and poor depth perception.  Ms. Speck began using a guide dog for navigation in the fall of 2022.

173.    Prior to using a guide dog, Ms. Speck used Uber often and had never been discriminated against while using Uber's services.  That changed once she began to use a guide dog.

174.    In January 2023, Ms. Speck was in San Diego, California and requested an Uber to transport her and a sighted friend to their hotel.

175.    When the driver arrived, he rolled down his window and told Ms. Speck he could not take her dog.

176.    Ms. Speck told the driver that it was a service dog and the driver was required to transport her.

177.    The driver then asked for the dog's papers.

178.    Ms. Speck informed the driver that there is no national registry for service dogs. She did, however, show him an unofficial card from the agency from which Ms. Speck had obtained her service dog.

179.    The driver then told Ms. Speck that he could not take her, alleging he was allergic to dogs.

180.    The Uber app informed Ms. Speck that her driver had canceled the ride and it connected Ms. Speck with a new driver.

181.    When the new driver arrived, he saw Ms. Speck's service dog and started shaking his head and waving his hand. The driver left without stopping the car.

182.    Ms. Speck broke down in tears.

183.    Because of the two denials she experienced in January 2024, Ms. Speck now feels apprehensive and fearful when using Uber. She is uncertain whether she will be denied service again and whether she will be late for her appointments. The denials made Ms. Speck feel that her world is getting smaller and that now she is not even deserving of a ride.

184.    Ms. Speck rarely uses Uber when traveling with her service animal anymore. Instead, she relies primarily on her brother to drive her. If she needs to use Uber, Ms. Speck will leave her service animal at home, which is not something she wants to do and deprives her of the service animal's aid for her disability.

**Ryan Honick**

185.    Ryan Honick lived in Alexandria, Virginia and recently moved to Seattle, Washington. Mr. Honick has cerebral palsy. He uses a service dog to assist with tasks, including opening doors, turning on and off light switches, and retrieving and delivering items.

186.    In January 2024, he retired his service dog and did not get a new service dog until March 2025.

187.    When traveling with a service dog, Uber's drivers routinely deny rides to Mr. Honick.  In contrast, he does not experience this discrimination when traveling without a service dog.

188.    When traveling with his previous or, now, a new service dog, Uber has denied Mr. Honick rides because of his service dog in Washington, D.C., Virginia, and other locations.

189.    In July 2025, Mr. Honick called an Uber around noon to take him to a 1:00 p.m. meeting in downtown Washington, D.C.  Several drivers in a row refused to provide him service after learning he was traveling with a service animal.  Frustrated, and knowing he would be late to his meeting, he ordered an Uber Pet, which cost him more money.  He finally arrived at his destination about 15 minutes late.

190.    Drivers have questioned whether Mr. Honick's service dog will vomit in the car, sit on the car seat, or attack the driver.  A driver has commented that Mr. Honick's service dog is too big.

191.    One driver told Mr. Honick he regularly claims a rider was not present at the pickup location to avoid accommodating their service animal.

192.    Uber has charged Mr. Honick cleaning fees because of his service dog.

193.    In one instance, Uber charged Mr. Honick a $150 cleaning fee after a ride he took with his service dog.  Below is a screenshot showing the charge.



194.    Uber refunded the cleaning fee only after Mr. Honick disputed the fee.

195.    Mr. Honick will sometimes travel without his service dog to avoid ride denials.

196.    Additionally, he now often uses Uber Pet, which costs him more money, to avoid ride denials because of his service animal.

197.    He is frustrated at having to build in rejection time into his itinerary and having to spend time documenting the denials or filing complaints.

**J.E.**

198.    J.E., a minor, lives in the Bronx, New York with his mother and brother.  J.E. is a bilateral amputee who uses a collapsible wheelchair.

199.    In June 2023, when J.E. was seven years old, he went to Pelham Bay Park in the Bronx to celebrate his brother's birthday.

200.    When the birthday party was over, J.E.'s mother and her friend called two UberXLs to take the guests in attendance to their homes.

201.    When the driver of the first UberXL arrived in a large SUV, he pointed at J.E.'s wheelchair and asked "is that coming."

202.    When J.E.'s mother confirmed that they would be traveling with her son's wheelchair, the driver responded that he could not fit the wheelchair in his vehicle and refused them service.

203.    J.E.'s mother asked him to cancel the ride so that Uber would send another driver, but he refused, resulting in J.E.'s mother being charged a cancellation fee.

204.    J.E.'s mother routinely stows his wheelchair into smaller, standard-sized sedans, and was certain that J.E.'s wheelchair could fit into his SUV.

205.    It was cold and dark outside while J.E. and his family and friends waited 45 minutes for an alternative ride home, and the children were scared.

206.    While they were waiting, J.E.'s mother saw the UberXL driver who had refused to transport them earlier pick up a different group from the park and store that group's large double wagon without issue.

207.    This incident embarrassed J.E. because he felt responsible for his family and friends being stranded at the park.

208.    When J.E.'s mother reported this incident to Uber, Uber reversed the cancellation fee and gave her a $15 credit, which she described as a "slap on the face."

209.    Even when Uber provides J.E. service, Uber's drivers are often reluctant to store J.E.'s wheelchair and only provide service after J.E.'s mother convinces the drivers that J.E.'s wheelchair will fit in the trunk.

210.    Uber's drivers also often ask J.E. questions about his disability that are rude, insensitive, and upsetting to him.

211.    J.E. has a poor self-image due to his disability and his mother fears that the repeated questions from Uber's drivers about his disability are contributing to J.E. feeling depressed.

212.    Because J.E.'s mother must convince Uber's drivers to stow his wheelchair and Uber's drivers often ask J.E. intrusive questions about his disability, his mother often leaves him at home while she goes out.

**Kingsly Joseph**

213.    Kingsly Joseph lives in Trumbull, Connecticut.  Mr. Joseph is paraplegic and uses a manual wheelchair.

214.    Mr. Joseph relies on Uber approximately two to three times a week, including to commute to his job as a medical physicist in radiation oncology at St. Vincent's Medical Center in Bridgeport, Connecticut.

215.    When Mr. Joseph travels with Uber, he transfers himself into the vehicle and takes his wheelchair apart and folds it without assistance, and only requires assistance stowing his wheelchair in the vehicle.

216.    Uber's drivers routinely deny rides to Mr. Joseph because he uses a wheelchair, including at least as recently as August 2025.

217.    Many drivers cancel rides immediately if Mr. Joseph provides advance notice that he will need assistance stowing his wheelchair in the car.

218.    Other drivers pull up to Mr. Joseph's location and deny the ride when they see that he uses a wheelchair, incorrectly stating that they are not allowed to help him stow his wheelchair.

219.    Other times, Mr. Joseph must plead with and convince drivers to transport him.

220.    As a result of Uber's discrimination, Mr. Joseph has suffered financial harms as well as significant frustration and emotional distress.  He has been late to work because of ride denials, has been required to wait extended periods to be matched with new drivers—on some occasions in inclement weather—and has also been charged cancellation fees.

**Vincent Coleman**

221.    Vincent Coleman lives in Las Vegas, Nevada.  Mr. Coleman has a neurological condition that substantially limits his gait and speech.

222.    In January 2023, Mr. Coleman requested an Uber ride from his house so that he could pick up his wife's car from a parking lot in Henderson, Nevada.

223.    Because of his disability, it takes Mr. Coleman a longer time to get ready to leave the house. Knowing this, he began getting ready more than an hour before his Uber driver arrived.  He then went downstairs and sat outside to wait for the driver.

224.    When Mr. Coleman saw the Uber driver turn onto his street, he began making his way down the driveway to the street.

225.    As he got halfway to the end of the driveway, the Uber driver rolled down her window and said that she would not take him because she thought something might happen to him while he was in her car.

226.    As the driver started to pull away, Mr. Coleman tried his best to hurry after her, begging her multiple times to stop and not to leave.

227.    The driver left anyway.

228.    Mr. Coleman was extremely humiliated.  He broke down in tears as he slowly made his way back to his house.  He was not able to pick up his wife's car.

229.    Because of this incident, Mr. Coleman has refused to use Uber again.  Often his wife must take time off from work to drive him to doctor's appointments when he cannot drive himself and would have used Uber in the past.

### B.    Uber's Unequal Treatment of Riders with Disabilities

230.    When Uber does not outright deny service to individuals with disabilities, it often discriminates against them in other ways.  Uber's drivers unlawfully impose disability-related surcharges, including cleaning fees related to their service animals, refuse to reasonably accommodate their disability-related needs, and in some instances speak to them in ways that are insulting and demeaning.

231.    In addition to the passengers described above, Jeff Clark, Frank Coon, Elizabeth Lawrence, and Kristen Ingalz—all people with disabilities as defined under the ADA—have all been affected by Uber's discriminatory conduct, as have many other similarly situated individuals with disabilities who have used Uber's services.

**Jeff Clark**

232.    Jeff Clark lives in Mount Laurel, New Jersey.  Mr. Clark is blind and uses a guide dog for navigation.

233.    Mr. Clark's wife is also blind and uses a guide dog for navigation.

234.    Mr. Clark relies on Uber to travel to his job as a vocational counselor and other important places.

235.    Mr. Clark notifies drivers in advance that he is blind, asks them to identify themselves when they arrive since he will not be able to identify their specific vehicle, and that he is traveling with a service animal/guide dog.

236.    Mr. Clark is routinely denied rides from Uber after drivers learn he is traveling with his guide dog.

237.    For example, while visiting Philadelphia in May 2025, Mr. Clark and his wife requested an Uber to take them to their hotel.  Over a 17-minute period, four drivers in a row denied them service after Mr. Clark sent the driver a notification saying that he is blind and travels with a guide dog.

238.    As shown in the screenshot below, the first driver canceled his ride at 9:17 p.m., the second driver canceled at 9:26 p.m., the third driver canceled at 9:32 p.m., and the fourth driver canceled at 9:34 p.m.

1



2

3

4

5

6

7

8

9

10

11

12

239.    In addition to Uber frequently denying him rides because of his guide dog, Mr. Clark has

13

14
also been discriminated against by Uber in other ways when using Uber's service.

15
240.    For example, an Uber driver once became lost while transporting Mr. Clark, causing Mr.

16
Clark to be charged an additional $13 for his ride.  As a result, Mr. Clark requested a fare adjustment from

17
Uber.  While Uber acknowledges the driver took a longer route than expected, Uber refused to refund Mr.

18
Clark for the inflated fare because Uber had flagged his account for receiving too many credits, some of

19
which were related to ride denials due to Mr. Clark's service dog.

20
241.    Below is a screenshot of Uber's response to Mr. Clark:

21



22

23

24

25

26

27

28

242.    Mr. Clark feels much safer when he uses a service animal but now, to avoid Uber cancelations, he often chooses to leave his service dog at home for shorter Uber trips to places he knows he can navigate alone.  Mr. Clark recently considered not using a service animal at all so that he can avoid the frequent service denials he experiences from Uber's drivers because of his service animal, the time and money lost as a result, and the frustration of having to frequently utilize Uber's inadequate complaint process.

243.    Because of the frequent ride denial, Mr. Clark often builds in additional time to his itinerary to make sure he arrives at his destination on time.  Sometimes Mr. Clark will request an Uber Pet, even though it costs more money, to reduce the likelihood of getting denied a ride because of his guide dog

**Frank Coon**

244.    Frank Coon lives in Savannah, Georgia.  He is blind and uses a guide dog for travel.

245.    Mr. Coon's wife is also blind.  Mr. Coon and his wife both use Uber.

246.    Mr. Coon finds Uber unreliable because he needs to budget extra travel time for the frequent ride denials he experiences because of his service animal.

247.    Mr. Coon and his wife have been frequently denied rides because of his guide dog.

248.    For example, in June 2025, Mr. Coon's wife requested an Uber to take Mr. Coon to a doctor's appointment.  Mr. Coon's wife sent a message notifying the driver that Mr. Coon is blind.  Shortly thereafter, the driver canceled the ride.  A second Uber driver drove up to Mr. Coon and canceled the ride after seeing Mr. Coon's service dog.

249.    In or around late 2024, Mr. Coon's wife ordered an Uber to pick them up at their home to take them to a doctor's appointment.  The driver arrived and told them the dog would not be riding in his car.  Mr. Coon explained he was a seeing-eye dog and that refusing them service would be against the law. The driver refused to transport them and drove away.

250.    In addition to frequent ride denials, Mr. Coon has experienced other discrimination when using Uber.

251.    On one occasion, an Uber driver initially refused to give Mr. Coon, his wife, and his service animal a ride home from a restaurant in Savannah, Georgia.

252.    The driver gave them a ride only after they, and other restaurant patrons, informed the driver that he would be violating the law if he refused.

253.    The driver did not speak or respond to Mr. Coon or his wife during the ride and drove by their house multiple times without dropping them off.

254.    Mr. Coon was concerned about having to pay an inflated fare and asked to be dropped off at a nearby grocery store from which he and his wife walked home.

255.    Mr. Coon was charged a cleaning fee even though he had informed the driver that his dog is a service animal.

**Elizabeth Lawrence**

256.    Elizabeth Lawrence lives in Briarcliff Manor, New York and previously lived in Scarsdale, New York.  Ms. Lawrence has a prosthetic leg and uses a small walker because her right leg is amputated below the knee.

257.    In July 2024, Ms. Lawrence requested an Uber in Scarsdale, New York, to take her to the hospital to pick up her husband after a medical procedure.

258.    Ms. Lawrence notified the driver in advance that she has a prosthetic leg, uses a small walker, and needs to sit in the front seat because her prosthetic leg does not bend.

259.    When the Uber driver arrived at Ms. Lawrence's house, he refused to let her sit in the front seat.

260.    He gestured and yelled at her to sit in the back.

261.    The driver's demeanor was so aggressive that Ms. Lawrence was afraid he would hit her and ultimately decided not to go to the hospital.

262.    Ms. Lawrence has filed multiple complaints with Uber about drivers refusing to allow her to sit in the front seat, but she continues to experience discrimination.

**Kristen Ingalz**

263.    Kristen Ingalz lives in San Jose, California.  Ms. Ingalz is legally blind and has used a guide dog for navigation since December 2022.

264.    Because Ms. Ingalz has experienced ride denials because of her guide dog, Ms. Ingalz will often leave her guide dog at home when relying on Uber for transportation.  Alternatively, she will pay more money for Uber Pet when traveling with her guide dog.

C.    **Uber's Failure to Make Reasonable Modifications**

265.    Uber's drivers have refused to make reasonable modifications to their usual practices when necessary to avoid discrimination against riders with disabilities.

266.    For example, Ms. Lawrence regularly informs drivers that she needs to sit in the front passenger seat because her prosthetic leg does not bend.  She usually notifies drivers of this need as soon as possible by sending them a message when she and a driver are matched.

267.    Nonetheless, many Uber drivers have refused to let Ms. Lawrence sit in the front passenger seat, in some instances citing minor inconveniences such as not wanting to move a water bottle or other personal items off their front seat.

268.    Because Ms. Lawrence cannot sit in the back seat, when she is denied her requested modification, she must either forego whatever trip she had planned or wait for another driver to arrive who will let her sit in the front seat.

269.    Uber also fails to modify generally applicable policies and procedures that adversely affect people with disabilities.

270.    For example, Uber has a policy or practice of limiting credits to passengers once they have reached a certain cap.

271.    Some passengers who are blind and use service animals have hit this cap because they have frequently been denied service for discriminatory reasons and have filed complaints that Uber has responded to with credits or reimbursements.

272.    Uber has flagged these passengers' accounts for receiving too many credits and has generally refused to offer them further credits or reimbursements.

273.    For example, Mr. Clark was denied a fare adjustment because Uber determined he received too many credits—even though many of these credits were because he was discriminated against because of his service dog.

### D.     <u>Uber's Failure to Prevent or Correct Disability Discrimination</u>

274.    All the above discriminatory conduct flows directly from and is exacerbated by Uber's broader failures to prevent discrimination against individuals with disabilities or provide meaningful relief to those it harms.

275.    Uber has notice of the widespread disability-based discrimination in its transportation services, yet has failed to prevent it.

276.    Uber does not adequately train its drivers or customer service representatives about their ADA obligations, including how to properly assist and treat individuals with disabilities who use Uber's transportation service in a respectful and courteous way.

277.    Uber does not adequately monitor its drivers to prevent disability-based discrimination.

278.    Uber fails to independently review and verify that its drivers have not improperly charged riders additional fees or surcharges because the riders use service animals or mobility devices or for other disability-related reasons.

279.    Nor does Uber adequately address and remedy complaints of discrimination by, for example, removing drivers who discriminate from its platform or by otherwise effectively penalizing or training those drivers to ensure they do not discriminate in the future.

280.    Instead, as detailed above, Uber regularly provides "relief" to complainants that does not adequately compensate them for the harm they have suffered.

281.    Many riders with disabilities do not bother filing complaints against Uber each time they are discriminated against because they so rarely get a meaningful response and have not experienced an improvement in service.

### E.     <u>Uber's Discrimination Significantly Harms People with Disabilities</u>

282.    Uber's discriminatory conduct has negatively affected people with disabilities who use or try to use Uber's services in other ways.

283.    Many passengers and their companions often need to educate Uber's drivers about how federal law and Uber's policy require its drivers to transport riders with their service animals or wheelchairs.

284.    This process is frustrating, demeaning, stressful, and time consuming.  It often puts passengers with disabilities in embarrassing positions in front of friends, family members, colleagues, and strangers and is only made worse when it is unsuccessful and does not prevent a service denial.

285.    Uber also harms people with disabilities through its denials of service and unequal treatment by failing to implement effective processes for remedying its own discriminatory conduct.

286.    To avoid denials and negative interactions with Uber's drivers and representatives, many people with disabilities take precautionary steps that cost them time, effort, and money, and that make them feel less comfortable, safe, and independent.

287.    Passengers with disabilities often build in extra travel time because they expect Uber's drivers to deny or cancel their rides.

288.    Some passengers who travel with service animals pay extra to take Uber Pet to avoid ride denials and negative interactions with Uber drivers.

289.    Other passengers leave their service animals at home and travel with a cane to avoid ride denials.  These passengers do not feel as comfortable or safe without their service animals.

290.    Other passengers who have been discriminated against by Uber because of their disabilities have stopped requesting Uber rides whenever possible to avoid feeling humiliated, embarrassed, or unsafe.

291.    These passengers instead rely on less convenient options for travel, including walking, public transit, or rides from family or friends.  They also at times forego outings when Uber is the only feasible mode of transportation.

292.    Some passengers continue to rely on Uber despite the challenges and harms they suffer from Uber's discriminatory conduct because there is no other viable transportation option for them to travel to work or other commitments.

## VI.    CAUSE OF ACTION

### A.    Violation of Title III of the Americans with Disabilities Act

293.    The United States re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

294.    Uber has discriminated against individuals with disabilities, in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt.

37, through its policies and practices of denying or providing unequal services to individuals with disabilities, including individuals with service animals or individuals who use stowable wheelchairs or mobility devices.

295.    Uber's violations of the ADA amount to a pattern or practice of discrimination.

296.    Uber's discrimination against individuals with disabilities under the ADA raises an issue of general public importance.

297.    Uber's discrimination includes:

a.    Denying full and equal access to individuals with disabilities in violation of 42 U.S.C. § 12184(a); *see also* 49 C.F.R. § 37.5(f);

b.    Denying individuals with disabilities the opportunity to use Uber's transportation service, if they are capable of using that service, 49 C.F.R. §§ 37.5(b), 37.29(c); *see also* 42 U.S.C. § 12184(b)(1), (2);

c.    Refusing to permit service animals to accompany individuals with disabilities in vehicles, in violation of 49 C.F.R. § 37.167(d); *see also* 42 U.S.C. § 12184(a);

d.    Denying equal service or assistance to individuals with disabilities, including assistance with stowing mobility devices when needed, in violation of 49 C.F.R. § 37.29(c); *see also* 42 U.S.C. § 12184(a);

e.    Denying equal service to individuals with disabilities because of their appearance or involuntary behavior, in violation of 49 C.F.R. § 37.5(h); *see also* 42 U.S.C. § 12184(a);

f.    Imposing higher fees and unnecessary surcharges on individuals with disabilities including those who travel with service animals or mobility devices, in violation of 49 C.F.R. §§ 37.5(d), 37.29(c);

g.    Failing to ensure that personnel are trained to proficiency, as appropriate to their duties, so that they can properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, 49 C.F.R. § 37.173; *see also* 42 U.S.C. § 12184(a);

h.    Failing to adopt complaint procedures that provide for the prompt and equitable resolution of complaints alleging disability discrimination, including prompt communication of the

1  entity's response and reasoning for its response to each complainant, 49 C.F.R. § 37.17(b); *see also* 42

2  U.S.C. § 12184(a); and

3         i.    Refusing to make reasonable modifications to its policies, practices, and procedures

4  necessary to avoid discrimination.  *See* 42 U.S.C. § 12184(b)(2)(A); 49 C.F.R. § 37.5(f); *see also* 42

5  U.S.C. § 12184(a) and 28 C.F.R. § 36.302 (incorporated by reference in 49 C.F.R. § 37.5(f)).

6     298.    Uber's violations of the ADA have harmed and continue to harm individuals with

7  disabilities who, because of Uber's discrimination, are entitled to monetary damages, including

8  compensatory and emotional distress damages.  42 U.S.C. § 12188.

9                          **VII.    PRAYER FOR RELIEF**

10     Plaintiff United States prays this Court:

11     A.    Grant judgment for the United States and declare that Uber's actions, policies, and

12  practices, as alleged in this complaint, violate Title III of the ADA, 42 U.S.C. §§ 12181–89, and its

13  implementing regulation, 49 C.F.R. pt. 37;

14     B.    Enjoin Uber, its officers, agents, employees, drivers, and all others in concert or in

15  participation with it, from discriminating against individuals with disabilities, and failing to comply with

16  Title III of the ADA, 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37;

17     C.    Order Uber to modify its policies, practices, and procedures to comply with Title III of the

18  ADA, 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37;

19     D.    Order Uber to provide ADA training to its officers, agents, employees, drivers, and all

20  others in concert or in participation with it to a proficient level to meet ADA requirements;

21     E.    Award monetary damages, including compensatory damages for emotional distress, pain

22  and suffering, and other injuries, to persons aggrieved by Uber's actions or failures to act, pursuant to 42

23  U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37;

24     F.    Assess a civil penalty against Uber pursuant to 42 U.S.C. § 12188(b)(2)(C), to vindicate

25  the public interest; and

26     G.    Order such other appropriate relief as the interests of justice may require, together with the

27  United States' costs and disbursements in this action.

28

## VIII.    JURY DEMAND

Plaintiff demands a trial by jury as to all issues.

Respectfully submitted this 11th day of September, 2025

CRAIG H. MISSAKIAN
United States Attorney
Northern District of California


MICHAEL A. KEOUGH
Assistant United States Attorney

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

R. JONAS A. GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

/s/ Jane E. Andersen

KEVIN J. KIJEWSKI
Deputy Chief
JANE E. ANDERSEN
KATHERINE DUTCHER
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice