ALAN E. SCHOENFELD (*pro hac vice* forthcoming)
alan.schoenfeld@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 937-7294
Facsimile: (212) 230-8888

BENJAMIN J. YOOD (SBN 301688)
jamie.yood@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, DC 20037
Telephone: (202) 663-6695
Facsimile: (202) 663-6363

*Attorneys for Defendant*
*Uber Technologies, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>   vs.<br><br>Uber Technologies, Inc.,<br><br>                Defendant. | Case No.  3:25-cv-7731-SK<br><br>**UBER TECHNOLOGIES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>Hearing Date:  March 9, 2026<br>Time:  9:30 a.m.<br>Place:  Courtroom C – 15th Floor |

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ........................................................................... 1

II.   FACTUAL BACKGROUND ........................................................... 2

III.  LEGAL FRAMEWORK .................................................................. 5

IV.   ARGUMENT ................................................................................... 6

    A.    The Complaint Does Not Sufficiently Allege That Uber Is "Primarily Engaged In The Business Of Transporting People" And Covered By The ADA ...................... 6

    B.    The Government Fails To Adequately Plead A Pattern Or Practice ...................... 9

        1.    Isolated instances where individual drivers violated Uber policy by denying service do not plausibly allege a pattern or practice by Uber. .................. 10

        2.    Individual drivers charging facially neutral fees that Uber refunds do not plausibly allege a pattern or practice of Uber charging higher fees. ........ 13

        3.    Instances where individual drivers violated Uber policy do not plausibly allege a pattern or practice of Uber failing to train. ................................. 16

        4.    Some riders not receiving their preferred outcomes does not plausibly allege a pattern or practice of inequitable complaint procedures. ....................... 17

        5.    A few drivers refusing an individual's request to sit in the front seat or Uber capping refunds do not plausibly allege a pattern or practice of Uber failing to make reasonable modifications ............................................................ 20

        6.    The same allegations that fail to state other ADA violations cannot plausibly allege a catchall ADA violation based on the same conduct. ................... 21

    C.    The Government Fails To Plausibly Allege That Uber Is Liable For Individual Drivers' Discrimination In Violation Of 42 U.S.C. § 12188(b)(1)(B)(ii) ............ 22

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666
    (9th Cir. 2010)....................................................................................................14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................2

*Balistreri v. Pacifica Police Department*, 901 F.2d 696 (9th Cir. 1988).........................5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................5

*Buckner v. Omnimed Medical Services Corp.*, 2023 WL 12144750
    (C.D. Cal. July 26, 2023) ...................................................................................23

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ........................................23

*C.R. Dept. v. Grimmway Enterprises, Inc.*, 800 F. Supp. 3d 1084 (E.D. Cal. 2025)....................10

*Carroll v. American Empire Surplus Lines Insurance Co.*, 289 F. Supp. 3d 767
    (E.D. La. 2017) ....................................................................................................8

*Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003).........................................9, 10

*Crawford v. Uber Technologies, Inc.*, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018).....................9

*Disabled in Action of Pennsylvania v. National Passenger Railroad Corp.*, 418 F.
    Supp. 2d 652 (E.D. Pa. 2005) ........................................................................14, 21

*Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001), *as amended on denial
    of reh'g* (Oct. 11, 2001) ...................................................................................23

*Ellis v. Costco Wholesale Corp.*, 2015 WL 2453158 (N.D. Cal. May 22, 2015).........................13

*Equal Rights Center v. Uber Technologies, Inc.*, 525 F. Supp. 3d 62
    (D.D.C. 2021) ......................................................................................................9

*Fahey v. Uber Technologies, Inc.*, 2025 WL 2954976 (N.D. Cal. Sept. 21, 2025).......................11

*Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019).............................................................15

*Gonzales v. Uber Technologies, Inc.*, 305 F. Supp. 3d 1078 (N.D. Cal. 2018)............................9

*Goodwin v. Marin County Transit District*, 675 F. Supp. 3d 1016 (N.D. Cal. 2022) ................................................................................................16

*Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158 (D.D.C. 2014) ........................23

*In re Calpine Security Litigation*, 288 F. Supp. 2d 1054 (N.D. Cal. 2003)................................6

*In re CNET Networks, Inc.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007) ........................................6

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) ................ *passim*

*Jackson v. Airbnb, Inc.*, 654 F. Supp. 3d 990 (C.D. Cal. 2023) ...........................................8

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ....................................3

*King. v. Pleasant 30 LLC*, 2022 WL 12827986 (N.Y. Sup. Ct. Oct. 6, 2022) ..............................8

*Love v. Ashford San Francisco II LP*, 2021 WL 1428372 (N.D. Cal. Apr. 15 2021) ..............................................................................14

*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006)..........................................................6

*Matthew-Ajayi v. Airbnb, Inc.*, 2025 WL 487572 (D. Md. Feb. 13, 2025), *appeal dismissed*, 2025 WL 2602547 (4th Cir. July 15, 2025) ................................8

*Namisnak v. Uber Technologies, Inc.*, 444 F. Supp. 3d 1136 (N.D. Cal. 2020)..........................9

*National Collegiate Preparatory v. D.C. Charter School Board*, 2019 WL 7344826 (D.D.C. Dec. 11, 2019) ................................................18

*O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133 (N.D. Cal. 2015) ............................9

*Ringcentral, Inc. v. Nextiva, Inc.*, 2021 WL 2476879 (N.D. Cal. June 17, 2021)........................23

*Salyers v. Metropolitan Life Insurance Co.*, 871 F.3d 934 (9th Cir. 2017)................................23

*Scherr v. Marriott International Inc.*, 703 F.3d 1069 (7th Cir. 2013) ..........................................15

*Smith v. Google, LLC*, 735 F. Supp. 3d 1188 (N.D. Cal. 2024) ........................................3

*SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989 (C.D. Cal. Dec. 27, 2016)....................24

*Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755 (C.D. Cal. 2015) ..............................6

*State v. Priceline.com, Inc.*, 172 N.H. 28 (2019) ........................................................8

*Ste. Marie v. Eastern Railroad Ass'n*, 650 F.2d 395 (2d Cir. 1981)..............................................13

*Szwanek v. Jack in the Box, Inc.*, 2021 WL 5104372 (9th Cir. Nov. 3, 2021) ............................21

*Turo v. Superior Court of City & County of San Francisco*, 80 Cal. App. 5th 517
    (2022) .........................................................................................................8

*United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979).....................................23

*United States v. Fitness International LLC*, 2025 WL 2093424
    (C.D. Cal. June 6, 2025) ................................................................ *passim*

*United States v. Town of Colorado City*, 935 F.3d 804 (9th Cir. 2019) .......................23

*Village of Bedford Park v. Expedia, Inc.*, 876 F.3d 296 (7th Cir. 2017) .........................7

*Washington v. Matheson Flight Extenders, Inc.*, 440 F. Supp. 3d 1201 (W.D.
    Wash. 2020) ...........................................................................................11

## STATUTES, RULES, AND REGULATIONS

28 C.F.R. § 36.302 ........................................................................4, 14, 20

49 C.F.R. § 37.5 ............................................................................. *passim*

49 C.F.R. § 37.17 ...................................................................4, 17, 18, 19

49 C.F.R. § 37.29 ...................................................................4, 11, 14, 13

49 C.F.R. § 37.167 ...........................................................................4, 11

49 C.F.R. § 37.173 ...........................................................................4, 16

42 U.S.C. § 12184 .......................................................................... *passim*

RCW 49.46.300 ................................................................................19

## OTHER AUTHORITIES

U.S. Department of Labor's Wage and Hour Division Opinion Letter
    FLSA2025-2 (May 2, 2025) ............................................................2

Restatement (Second) of Agency § 228(1)(c) (Am. Law Inst. 1958)...........................23

Restatement (Second) of Agency § 230 (Am. Law Inst. 1958)................................23

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 9, 2026 at 9:30 a.m., or on such date and time as the Court prefers, before Magistrate Judge Sallie Kim of the United States District Court for the Northern District of California, Uber Technologies, Inc. will move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss this action. The grounds for this motion, as set forth in detail below, are that the United States has failed to state a claim under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12188, because it has failed to plausibly allege that Uber is primarily engaged in the business of transporting people, is engaged in a pattern or practice of discrimination, or is vicariously liable for alleged discrimination committed by drivers using the Uber app.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This case is about whether Uber engaged in a pattern or practice of discrimination under 42 U.S.C. § 12184. The complaint fails as pleaded because DOJ is unable to point to any discriminatory policies or acts committed by Uber itself and instead alleges only that a small number of drivers—all independent third parties—violated Uber's policies in isolated incidents.

*First*, the Complaint fails to plausibly allege that Uber is covered by the Americans with Disabilities Act ("ADA"). In particular, the Complaint includes no well-pleaded allegations showing that Uber, a technology company that operates smartphone apps and online marketplaces, is "primarily engaged in the business of transporting people," as is required by the ADA.

*Second*, the Complaint fails to plausibly allege that a handful of drivers denying service or charging fees *in violation of Uber policy* constitutes a pattern or practice *by Uber* of denying service, imposing improper fees, failing to train, lacking complaint procedures, or refusing reasonable accommodations. Drivers are required to acknowledge Uber's antidiscrimination policies before accepting their first trip, and Uber regularly provides reminders to drivers of their obligations. The government acknowledges that several of the drivers who allegedly denied service

to disabled riders were aware of the law and/or Uber's antidiscrimination policies but chose not to follow them. When a rider reports that a driver may have violated Uber's antidiscrimination policies, Uber takes swift action by investigating the report. If Uber determines that the driver knowingly violated its policy, Uber permanently deactivates the driver's account. If Uber cannot make a determination of knowing violation based on information provided, Uber issues a written reminder that reports of discrimination will lead to driver deactivation. Given these facts, the government does not—and cannot—plausibly allege that violating the ADA is Uber's "regular" practice, as the law governing its claim requires.

*Third*, without plausibly showing a pattern or practice, the government cannot hold Uber vicariously liable for discrimination that "raises an issue of general public importance" under § 12184 by aggregating isolated instances of discrimination by independent third-party drivers—conduct that is inherently outside the scope of any arguable agency relationship.

Because even after years of investigation the government lacks any colorable theory of discrimination by Uber, the Complaint should be dismissed with prejudice.

## II.    FACTUAL BACKGROUND[1]

Uber is a technology company that operates smartphone apps and online marketplaces for the rideshare, delivery, and freight industries. Compl. ¶ 30 (omitting all of Uber's business lines except for rideshare); *see also* U.S. Department of Labor's Wage and Hour Division Opinion Letter FLSA2025-2, at 2 (May 2, 2025), *available at* https://tinyurl.com/35psh8p5 (finding Uber to be a "virtual marketplace company" which "connects service providers to end-market consumers to provide a wide variety of services"). Uber's technology platform, in part, connects independent, third-party drivers looking to provide rides using their own vehicles—both taxis and cars not registered as taxis—with riders looking to hire a driver. Riders engage drivers via the app to pick them up and drive them to their destination. *Id.*

---

[1] Although many of the government's allegations and characterizations are inaccurate, for purposes of this motion only, Uber treats the Complaint's factual allegations (but not its legal conclusions) as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Uber maintains policies that are consistent with and reflect federal antidiscrimination law, prohibiting drivers from refusing to transport riders because of their service animals or wheelchairs. *See* Ex. 1 (Uber's Service Animal and Assistive Device Policy)[2]; Compl. ¶¶ 7, 73, 82, 283. The policy "prohibits drivers who use the Uber Driver App from denying service to a rider because of the rider's service animal," "from refusing service to a rider with a disability who can get into the vehicle on their own," and "from refusing to assist with stowing assistive devices like folding wheelchairs, crutches, canes and walkers." Ex. 1. And while no law requires that Uber terminate platform access to drivers that commit an act of discrimination, the policy provides for "no exceptions … due to allergies, religious objections, or a generalized fear of animals." *Id.* The policy also warns that "drivers who engage in discriminatory conduct in violation of Uber's policy may lose their ability to use the Driver App." *Id*. The same policy makes clear to drivers that "[r]iders with service animals are not required to pay cleaning fees for hair or shedding from a rider's service animal, and drivers are not entitled to such fees." *Id.*; *contra* Compl. ¶ 6. The policy informs riders with service animals that they may be eligible for refunds, consistent with Uber's refund policies, if they are nonetheless improperly charged for cleaning fees because of their service animal. Ex. 1; *contra* Compl. ¶ 7.

The government brings a single claim, alleging violation of Title III of the ADA, pursuant to the Attorney General's authority to enforce the ADA where it has reasonable cause to believe that "(i) any person or group of persons is engaged in a pattern or practice of discrimination under [the ADA]," or where "(ii) any person or group of persons has been discriminated against under

---

[2] The Court can properly consider the contents of Uber's Service Animal and Assistive Device Policy on a motion to dismiss. *See, e.g.*, *Smith v. Google, LLC*, 735 F. Supp. 3d 1188, 1194-1195 (N.D. Cal. 2024) (taking judicial notice of defendant's policies posted on public website and referenced in complaint). The Complaint refers to Uber's policy on disabled riders, *see* Compl. ¶¶ 7, 73, 82, 283, which is available online at https://tinyurl.com/yrvyd47k, is central to the government's claim that Uber's policies, practices, or procedures discriminate against riders with disabilities, and no party can question the authenticity of the copy of the policy attached to this motion. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002-1004 (9th Cir. 2018) (courts can consider documents incorporated by reference in the complaint when the complaint "refers extensively" to it or it "forms the basis of the plaintiff's claim[s]" (citation omitted)).

1   [the ADA] and such discrimination raises an issue of general public importance." 42 U.S.C.

2   § 12188(b)(1)(B).

3       The government's ADA claim alleges two bases for liability. *First*, the government seeks

4   to hold Uber liable for "a pattern or practice of discrimination under" § 12184, which is the only

5   subchapter alleged in the Complaint. Compl. ¶¶ 295, 297(a)-(i). The government alleges that Uber

6   engaged in a pattern or practice of discrimination based on various theories of conduct: (i) denying

7   service to riders with service animals or wheelchairs in violation of 49 C.F.R. §§ 37.5(b), 37.5(h),

8   37.29(c), 37.167; 42 U.S.C. § 12184(a), (b)(1), (b)(2); *see* Compl. ¶¶ 297(b)-(e); (ii) imposing

9   higher fees on those riders in violation of 49 C.F.R. §§ 37.5(d), 37.29(c); *see* Compl. ¶ 297(f);

10  (iii) failing to train drivers and service representatives in violation of 49 C.F.R. § 37.173; *see*

11  Compl. ¶ 297(g); (iv) lacking adequate complaint procedures in violation of 49 C.F.R. § 37.17(b);

12  42 U.S.C. § 12184(a); *see* Compl. ¶ 297(h); (v) refusing to make reasonable modifications to

13  policies in violation of 42 U.S.C. § 12184(b)(2)(A), 49 C.F.R. § 37.5(f), 28 C.F.R. § 36.302; *see*

14  Compl. ¶ 297(i); and (vi) otherwise denying full and equal access to those riders in violation of 42

15  U.S.C. § 12184(a), 49 C.F.R. § 37.5(f); *see* Compl. ¶ 297(a).

16      The government, however, does not allege any series of acts or omissions by Uber that

17  constitute a pattern or practice of any of these theories of discrimination; instead, it at most alleges

18  isolated instances of drivers who refused service, charged fees, or engaged in inappropriate

19  treatment of riders, all in contravention of Uber's policies. Compl. ¶¶ 5-7. The government alleges

20  that many of the drivers committed these violations knowing that they contravened Uber's policies

21  and the law. Compl. ¶¶ 54, 82, 97-100, 116-17, 123, 132, 140-41, 191. For example, the Complaint

22  alleges that one driver told a rider "that he did not care" about "Uber's policies" requiring him to

23  transport the service animal "and that he would not have the dog in his car." Compl. ¶¶ 80-82.

24  Another driver "said he did not care if Uber suspended him from its platform as a result" of refusing

25  to transport a rider with a service animal. Compl. ¶ 54.

26      *Second*, the government seeks to hold Uber liable for "discrimination … [that] raises an

27  issue of general public importance." Compl. ¶ 296. To the extent this theory alleges that Uber's

28

own alleged conduct is discrimination that is an issue of general public importance, it rises and falls with the government's pattern or practice claim. To the extent that this theory alleges that the service denials alleged in the Complaint—all of which were done by individual drivers—"raise[] an issue of general public importance," it fails to plead vicarious liability sufficient to carry that theory.

## III.    LEGAL FRAMEWORK

While individuals may pursue litigation for isolated instances of a Title III violation, the United States can only pursue litigation where it can establish "a pattern or practice of discrimination" or discrimination that "raises an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B). To survive a motion to dismiss for a pattern or practice claim, "the plaintiff must plead facts that allow the court to draw the reasonable inference that the defendant engaged in 'more than the mere occurrence of isolated or accidental or sporadic discriminatory acts.'" *United States v. Fitness Int'l. LLC*, 2025 WL 2093424, at *3 (C.D. Cal. June 6, 2025) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 (1977)). The plaintiff must plead either "the existence of an express discriminatory policy" or "sufficient instances of discrimination and anecdotal or statistical" evidence from which a discriminatory pattern or practice by the defendant can be reasonably inferred. *Id.*

While the Attorney General's determination of general public importance cannot be reviewed, "the complaint still must plead facts that, taken as true, plausibly demonstrate that [the defendant] violated the ADA commensurate with what the Attorney General has found to be of general public importance." *Fitness Intl. LLC*, 2025 WL 2093424, at *6. In making this assessment, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Complaints lacking a cognizable legal theory should be dismissed. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

1

## IV.    ARGUMENT

### A.    The Complaint Does Not Sufficiently Allege That Uber Is "Primarily Engaged In The Business Of Transporting People" And Covered By The ADA

A threshold issue is whether the complaint adequately pleads that Title III of the ADA even applies to Uber. The United States does not assert a "place of public accommodation" theory, but instead relies solely on Section 12184's "primarily engaged in the business of transporting people" clause. The Court should dismiss the Complaint in its entirety because it attempts to hold Uber liable under a specialized ADA provision designed to regulate common carriers like train companies, not software companies already subject to the ADA's generally applicable provisions.

Specifically, the government fails to plausibly allege, as it must for a claim under 42 U.S.C. § 12184, that Uber is "a private entity that is *primarily* engaged in the business of transporting people" and offers "specified public transportation services" subject to the ADA's special requirements for public carriers. § 12184(a) (emphasis added). Uber is a technology company that develops and operates smartphone apps that connect users with other users offering different services: food, delivery, freight shipping, and rides. There are no allegations that Uber actually owns the instruments of transportation, such as vehicles, or actually transports anyone. Bare legal conclusions aside, *see* Compl. ¶¶ 22-25, the government alleges only that Uber "controls" various aspects of the transaction between riders and drivers, *id.* ¶¶ 30-43, and ignores the rest of Uber's technology applications, which connect riders and other consumers with merchants and delivery service providers for meal preparation, grocery and other delivery services, as well as shippers with carriers in the freight industry.[3] In the absence of binding authority applying the ADA's

---

[3] Ex. 2 (Uber Technologies, Inc., Annual Report (Form 10-K) (Feb. 14, 2025) at 4, *available at* https://tinyurl.com/5hdtb9k2) (hereinafter "2024 Uber 10-K"). The court can take judicial notice of matters in the public record. *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 762 (C.D. Cal. 2015) (citing *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)); *see also In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953 (N.D. Cal. 2007) ("A court may take judicial notice of public filings when adjudicating a motion to dismiss a complaint for failure to state a claim upon which relief can be granted." (quoting *In re Calpine Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003)).

public-transportation provisions to software companies like Uber, these allegations do not plausibly show that Uber is itself engaged in the business of transporting people at all, much less that transporting people is Uber's primary business.

The Complaint does not allege even the indicia of an actual transportation company, like owning a fleet of vehicles, agreeing to provide rides, or employing drivers. Uber's app-based rideshare service provides an online platform that connects independent riders with independent drivers. This app exists not for Uber to provide transportation services, as the government alleges, Compl. ¶ 2, but instead to facilitate connections and reduce transaction costs for users seeking transportation and those offering such services using their personal vehicles. This is not the type of "business of transporting people" that § 12184 contemplates, as is evident from the provisions of that section regulating the purchase or lease of vehicles. 42 U.S.C. § 12184(b). These provisions—which have no application to Uber—make clear what Congress had in mind when it regulated the "business of transporting people."

Cases examining websites that merely facilitate connections between parties seeking a service and those providing the service underscore the government's failure. Courts have repeatedly found that where a website lacks ownership of or independent power to grant possession of the property being used to provide the service, the website is not engaged in the relevant business. The Seventh Circuit, for example, considered whether Expedia, an online travel agency that connects individuals seeking hotel rooms with hotels, "engaged in the business of renting hotel rooms." *Vill. of Bedford Park v. Expedia, Inc.*, 876 F.3d 296, 305 (7th Cir. 2017). In considering this equivalent question to the one presented here—namely whether Uber is "primarily engaged in the business of transporting people" under the ADA—the Court concluded that Expedia could not even be engaged (let alone *primarily* engaged) in the business of renting hotel rooms for the purpose of certain local ordinances because it lacked ownership over and independent power to grant possession of hotel rooms. *Id.* at 299-300. Another court similarly found that Priceline.com, Orbitz, Expedia, and Travelocity were not "operators" of hotels pursuant to local tax law because they do not own, staff, or maintain the hotels and have no involvement in the day-to-day

management or running of the hotels. *See State v. Priceline.com, Inc.*, 172 N.H. 28, 34-35 (2019). And the California Court of Appeal found that Turo, a company operating an app that connects individuals wishing to rent a car with individuals seeking to rent out their cars, could not be deemed in the business of renting passenger vehicles to the public because it does not own or otherwise control those vehicles. *Turo v. Superior Ct. of City & Cnty. of San Francisco*, 80 Cal. App. 5th 517, 522-524 (2022). In each of these cases, the courts had to examine whether the companies behind the applicable websites were engaged in the business that their users operated. In each case, they were not.[4]

Here too, the government has not plausibly alleged that Uber is primarily engaged in the business of transporting people merely because Uber, among other things, operates apps that connect individuals seeking rides or food deliveries with those offering them using their personal vehicles. The Complaint does not, and cannot, allege that Uber owns or even rents the cars operated by drivers who use Uber's app. Just as Expedia and Priceline cannot be primarily engaged in the business of renting hotel rooms they do not own or control, Turo cannot be in the business of renting vehicles it does not own, or Airbnb cannot be liable for harm at properties it does not control, Uber cannot be primarily engaged in the business of providing transportation services with vehicles it does not own or otherwise control. Like Expedia, Priceline, Turo, and Airbnb, Uber

---

[4] Courts have relatedly found that Airbnb does not exercise sufficient control of listed properties to be held liable for harm suffered by renters of properties booked on the Airbnb marketplace. *See, e.g.*, *Jackson v. Airbnb, Inc.*, 654 F. Supp. 3d 990, 994-995 (C.D. Cal. 2023) (Airbnb did not owe a negligence duty to a renter of a property on the Airbnb marketplace because "policies that allow Airbnb to regulate its platform" do not equate to "allow[ing] Airbnb to make physical changes to rental properties"); *Matthew-Ajayi v. Airbnb, Inc.*, 2025 WL 487572, at *3 (D. Md. Feb. 13, 2025) (Airbnb did not owe the renter of a property a duty as to the safety of the premises where "the level of control [Airbnb] exercises over its own online marketplace" is not equivalent to "the level of control exercised by owners of property"), *appeal dismissed*, 2025 WL 2602547 (4th Cir. July 15, 2025); *Carroll v. American Empire Surplus Lines Ins. Co.*, 289 F. Supp. 3d 767, 772 (E.D. La. 2017) (Airbnb does not control listed properties so as to establish a duty to protect third parties); *King. v. Pleasant 30 LLC*, 2022 WL 12827986, at *2 (N.Y. Sup. Ct. Oct. 6, 2022) ("Airbnb did not own operate manage, control maintain or supervise the property in question" and thus "owed no duty to the plaintiff" for purposes of negligence or premises liability).

offers a platform that expedites connections between individuals seeking a service with those offering the service. Compl. ¶ 30. Ultimately, the individuals seeking hotel rooms, rental vehicles, or properties or rides, and those offering such services, exist independent of Expedia, Turo, or Uber; these apps facilitate and expedite connections between the two parties.

Uber acknowledges that some courts (and none binding this one) have previously found other complaints sufficiently alleged coverage under Section 12184. These cases read the word "primarily" out of the statute's text, ignore the sound reasoning of *Expedia*, and fundamentally misconstrue the factual similarities between Uber and the platforms discussed in *Expedia* and related cases. *See Crawford v. Uber Technologies, Inc.*, 2018 WL 1116725, at *3-4 (N.D. Cal. Mar. 1, 2018); *Equal Rights Center v. Uber Technologies, Inc.*, 525 F. Supp. 3d 62, 84-85 (D.D.C. 2021); *Namisnak v. Uber Technologies, Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020); *O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133, 1142 (N.D. Cal. 2015). Compounding those errors, these cases fail to analyze whether Uber is primarily engaged in the business of transporting people in light of its substantial non-rideshare lines of business (including freight transport, meal preparation, grocery and other delivery services, *see supra* n.3). They also ignore that the same driver-rider pairing facilitated through Uber could be facilitated through Lyft or another app, given that many riders and drivers report using multiple ridesharing apps. *See Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1083 (N.D. Cal. 2018) ("Some drivers perform transport services through … two platforms simultaneously."). Just as Expedia expedites the connection between hotel and guest, Uber does the same with drivers and riders.

## B.    The Government Fails To Adequately Plead A Pattern Or Practice

Even if Uber were subject to Section 12184, the government has not plausibly alleged "a pattern or practice" of discrimination by Uber. Compl. ¶¶ 12, 44, 295. Showing a pattern or practice requires "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Teamsters*, 431 U.S. at 336. The alleged discrimination must have been "the company's standard operating procedure"—"the regular rather than the unusual practice." *Id.* A pattern or practice can be demonstrated by an express discriminatory policy. *Cherosky v.*

*Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003); *C.R. Dept. v. Grimmway Enters., Inc.*, 800 F. Supp. 3d 1084, 1110-1111 (E.D. Cal. 2025). The government does not allege that any Uber policy is expressly discriminatory.

Absent an express discriminatory policy, the United States' "allegations must contain statistical and/or anecdotal facts that permit the Court to reasonably infer that [Uber] discriminated against those with disabilities as part of its routine operations, not just that some" drivers using the Uber app committed "scattered ADA violations." *Fitness Int'l*, 2025 WL 2093424, at *3; *see also Cherosky*, 330 F.3d at 1247; *Grimmway*, 800 F. Supp. 3d at 1110-1111. The Complaint does not permit any such inference here.

The Complaint alleges that Uber engaged in a pattern or practice of discrimination based on theories of conduct violating distinct requirements of the ADA laid out in sub-parts of paragraph 297—denying service to riders with service animals or wheelchairs, imposing improper fees, failing to train, lacking complaint procedures, and denying reasonable accommodations. None is supported by statistical or adequate anecdotal facts to allow the Court to reasonably infer that *Uber* discriminated against those with disabilities as part of *Uber*'s routine operations. Instead, the government's allegations show that a handful of drivers knowingly violated Uber's antidiscrimination policy in isolated incidents. That is insufficient to state a pattern or practice claim, where the complaint also lacks any allegations sufficient to make Uber liable for driver behavior. Moreover, the government does not state an ADA violation at all with respect to certain theories, which at the very least requires dismissal of the pattern or practice claim to the extent predicated on those theories.

### 1. Isolated instances where individual drivers violated Uber policy by denying service do not plausibly allege a pattern or practice by Uber.

The government fails to plausibly allege that Uber engaged in a pattern or practice of denying service to riders with service animals or wheelchairs. Compl. ¶¶ 297(b)-(e).[5] The

---

[5] The Complaint alleges (at ¶¶ 297(b)-(e)) a pattern or practice of "[d]enying individuals with disabilities the opportunity to use Uber's transportation service, if they are capable of using that

government's only allegations—that individual drivers improperly denied service to riders with service animals or wheelchairs in violation of Uber's express policies, without providing any sense of the scope of the incidents across the Uber platform, *see, e.g., id.* ¶ 283—cannot support any plausible inference of a pattern or practice of denying service by Uber. Anecdotal allegations are not sufficient unless it implicates "a significant enough portion of [the defendant's] operation" or is accompanied by allegations about the existence of a discriminatory corporate-level policy, *see Fitness Int'l*, 2025 WL 2093424, at *5 (citing *Washington v. Matheson Flight Extenders, Inc.*, 440 F. Supp. 3d 1201, 1215-16 (W.D. Wash. 2020))—and are thus necessarily insufficient when the corporate-level policy expressly prohibits the discrimination at issue, as Uber's policy does here.

Uber policy "prohibits drivers … from denying service to a rider because of the rider's service animal," "from refusing service to a rider with a disability … and from refusing to assist with stowing assistive devices like folding wheelchairs." Ex. 1. There are no exceptions to this policy, and drivers who knowingly engage in discriminatory conduct in violation of Uber's policy lose their ability to use the Driver App. *See id.* Allegations that individual drivers have, in anomalous instances, violated this express Uber policy by refusing service cannot plausibly support the inference that Uber has adopted such conduct as "the company's standard operating procedure," such that it was or is "the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336. Uber's policies make clear: the alleged service denials by individual drivers, if true, are in violation of company policy and subject the driver to potential deactivation on the app. *See, e.g., Fahey v. Uber Techs., Inc.*, 2025 WL 2954976, at *1 (N.D. Cal. Sept. 21, 2025) (denying a

---

service" in violation of 49 C.F.R. §§ 37.5(b), 37.29(c), 42 U.S.C. § 12184(b)(1), (2); "[r]efusing to permit service animals to accompany individuals with disabilities in vehicles, in violation of 49 C.F.R. § 37.167(d)," 42 U.S.C. § 12184(a); "[d]enying equal service or assistance to individuals with disabilities, including assistance with stowing mobility devices when needed, in violation of 49 C.F.R. § 37.29(c)," 42 U.S.C. § 12184(a); and "[d]enying equal service to individuals with disabilities because of their appearance or involuntary behavior, in violation of 49 C.F.R. § 37.5(h)," 42 U.S.C. § 12184(a).

motion for preliminary injunction by a driver who sued Uber after it deactivated his account because he refused service to a passenger with a service animal).

Even setting aside the Complaint's failure to explain how driver conduct in direct contravention of express Uber policies plausibly shows that denying service is Uber's "standard operating procedure," the Complaint does not sufficiently allege that the drivers' alleged conduct was "systemwide." *Teamsters*, 431 U.S. at 336. For example, with regard to the allegation that Uber has a pattern or practice of "[d]enying equal service to individuals with disabilities because of their appearance or involuntary behavior," Compl. ¶ 297(e), the Complaint alleges one single instance of this occurring, *id.* ¶¶ 221-227. One instance out of billions of rides a year is insufficient to state a pattern or practice of denying service to individuals with disabilities because of their appearance or involuntary behavior.[6] *See Fitness Int'l*, 2025 WL 2093424, at *3 (allegations of "specific instances of discrimination by four members of LA Fitness" and "a number of generalized allegations of various ADA violations in some number of LA Fitness locations in the

---

[6] It is the government's burden to plead facts showing that Uber is engaged in a pattern or practice of service denials to riders with wheelchairs or service animals. *Teamsters*, 431 U.S. at 335. Without an express discriminatory policy (which the government does not allege), the government must allege statistically significant instances sufficient to infer that the alleged service denials are Uber's standard operating procedure. *Fitness Int'l. LLC*, 2025 WL 2093424, at *3, 5. The government fails to do so—and they cannot do so–despite having more than a year and the government's full investigatory apparatus to marshal sufficient facts to make such an allegation. The Complaint specifies 50 service denials occurring over the course of multiple years. *See, e.g.*, *id.* ¶¶ 54, 58, 71-72, 86, 100, 102, 107, 117, 123, 126, 131, 136, 145, 152, 165-166, 180-181, 189, 202, 225, 237, 248-249. This reflects a miniscule proportion of the number of rides completed through Uber, which number in the tens of millions per day and billions per year globally. *See, e.g.*, Ex. 2 at 49; Ex. 3 (Uber, *Uber Announces Results for Fourth Quarter and Full Year 2024*, (Feb. 5, 2024), *available at* https://tinyurl.com/5hd26nwn). Indeed, those 50 specified incidents support no plausible inference about frequency or regularity of service denials, and the government alleges no surveys or other documents that might suggest service denials occurred with any regularity. Roughly the same portion of those with disabilities use rideshare services compared to those without disabilities, and persons with disabilities who use rideshare services take a significantly larger number of trips than those without disabilities. *See* Ex. 4 (Bureau of Transportation Statistics, *Travel Patterns of American Adults with Disabilities*, *available at* https://tinyurl.com/e5e5t9f9). The Court can take judicial notice of matters in the public record. *See supra* n.3.

Dallas-Ft. Worth area" when taken together "fail to plausibly demonstrate a pattern or practice of discrimination"); *Ellis v. Costco Wholesale Corp.*, 2015 WL 2453158, at *5 (N.D. Cal. May 22, 2015) (granting summary judgment where the plaintiff had "at best" only "shown that she was retaliated against" and so had shown "nothing more than a scintilla of evidence to support a pattern-or-practice claim"); *Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 406-407 (2d Cir. 1981) (two incidents of discrimination in nine offices insufficient to establish a pattern or practice, absent evidence of a discriminatory policy).

That a tiny number of independent drivers disregard Uber's express policies is insufficient to allege that Uber was engaged in a "systematic and purposeful" denial of service for riders with service animals or wheelchairs. *Teamsters*, 431 U.S. at 342. Instead, the Complaint alleges "the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts" that are insufficient to state a pattern or practice claim. *Id.* at 336; *see also id.* at 360 n.46 (pattern or practice requires showing that an "apparently discriminatory result" is the "expected result of a regularly followed discriminatory policy").

### 2. Individual drivers charging facially neutral fees that Uber refunds do not plausibly allege a pattern or practice of Uber charging higher fees.

The government's next theory—that Uber had a pattern or practice of violating the ADA based on the imposition of higher fees and unnecessary surcharges, in violation of 49 C.F.R. §§ 37.5(d), 37.29(c), Compl. ¶ 297(f)—fails for four reasons.

*First*, the alleged higher fees do not violate the ADA. The Complaint identifies two kinds of alleged "higher fees and unnecessary surcharges": (1) that individuals are charged cancellation fees in certain circumstances when drivers unlawfully deny service and (2) that drivers may charge cleaning fees for animals. Compl. ¶ 6. 49 C.F.R. § 37.5(d) prohibits the imposition of "special charges," and 49 C.F.R. § 37.29(c) prohibits charging "higher fares or fees for carrying individuals with disabilities and their equipment than are charged to other persons." On their face, neither kind of allegedly higher fee is a "special charge" or "higher … fee" imposed on individuals with disabilities that are not "charged to other persons." 49 C.F.R. §§ 37.29(c), 37.5(d). Indeed, the

regulations allow charges for cleaning or other damage caused by a service animal. *See, e.g.*, 28 C.F.R. § 36.302(c)(8) (incorporated by 49 C.F.R. § 37.5(f)) ("If a public accommodation normally charges individuals for the damage they cause, an individual with a disability may be charged for damage caused by his or her service animal."). Conduct permitted by the ADA and its regulations and agency guidance does not state an ADA violation. *See, e.g.*, *Disabled in Action of Pa. v. Nat'l Passenger R.R. Corp.*, 418 F. Supp. 2d 652, 658 & n.3 (E.D. Pa. 2005) (rejecting ADA claim challenging fees that were consistent with specifically applicable DOT rules); *see also Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 672-673 (9th Cir. 2010) (affirming dismissal of ADA claim seeking to require movie theater to screen movies with open captioning where agency guidance expressly provided that movie theaters were not required to do so); *Love v. Ashford San Francisco II LP*, 2021 WL 1428372, at *4-5 (N.D. Cal. Apr. 15, 2021) (dismissing suit seeking to require hotel to provide more online information about accessibility than what agency guidance deemed sufficient, and collecting similar cases).

*Second*, this theory fails for the same reason the service denial theory does: It is a claim about what independent drivers did (in violation of Uber policy), not what Uber does. The Complaint is clear that the alleged fee charges are triggered by drivers, not Uber. *E.g.*, Compl. ¶ 230 ("Uber's drivers unlawfully impose disability-related surcharges, including cleaning fees related to their service animals …."). In fact, the entirety of the cleaning fee a driver charges a rider goes to the driver and not to Uber. *See* Ex. 5 (Uber's Cleaning Fees guide).[7] The government does not allege that Uber's policies regarding charging cancellation fees or cleaning fees are discriminatory, pointing instead to allegations that some drivers have in some instances imposed charges on riders with disabilities. As discussed above, that does not allege a pattern or practice by Uber. *See supra* Section IV.B.1.

---

[7] The Court can properly consider the contents of Uber's Cleaning Fees Policy, *available at* https://tinyurl.com/5n6d82f5. *See supra* n.1.

*Third*, the Complaint does not allege that riders with service animals actually have to pay the allegedly higher fees or unnecessary surcharges after they are triggered by a driver. To the contrary, as the Complaint acknowledges, Compl. ¶¶ 194, 208, Uber's policy provides that riders with service animals are entitled to a refund if a driver improperly imposes a cancellation fee or cleaning fee as a result of their service animal, *see* Ex. 1. There are no allegations that Uber knows that a cleaning fee requested by a driver is improper until the rider notifies Uber. And in any event, the Complaint does not allege that any of the identified fees or charges resulted in Uber denying a fare adjustment or refund request. *See* Compl. ¶ 93 (cancellation fees take time to contest); *id.* ¶ 118 (cancellation fee was charged, not that refund was requested and denied); *id.* ¶ 169 (same); *id.* ¶¶ 192-194 (cleaning fee was refunded after fee was disputed); *id.* ¶ 220 (cancellation fees, but not requests for refunds and denials); *id.* ¶ 255 (same).

*Finally*, the government's remaining allegation—that "Uber fails to independently review and verify that its drivers have not improperly charged riders additional fees or surcharges because the riders use service animals or mobility devices or for other disability-related reasons," Compl. ¶ 278—is not a violation of 49 C.F.R. §§ 37.5(d) or 37.29(c). Nothing in 49 C.F.R. §§ 37.5(d) or 37.29(c) prevents Uber from using refunds and fare adjustments to appropriately address any allegedly improper charges, whether for disability-related reasons or otherwise. That cleaning fees are permissible under specific regulations regarding service animals forecloses any theory that the same allegations could violate some other, more general ADA provision or regulation. *See, e.g.*, *Flores v. Barr*, 934 F.3d 910, 917 (9th Cir. 2019) (holding that the "more specific regulatory provision … governs, not the general"); *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077-1078 (7th Cir. 2013) (dismissing suit alleging a violation of general ADA rules governing all doors because defendant complied with the specific rules governing spring hinge doors).

1

2

### 3.    Instances where individual drivers violated Uber policy do not plausibly allege a pattern or practice of Uber failing to train.

3

4

The government's third failed theory contends that Uber has a pattern or practice of "[f]ailing to ensure that personnel"—namely drivers and service representatives[8]—"are trained to proficiency, as appropriate to their duties, so that they can properly assist and treat individuals with disabilities who use the service in a respectful and courteous way" in violation of 49 C.F.R. § 37.173. Compl. ¶ 297(g); *see also id.* ¶¶ 9, 276. At best, the Complaint alleges a failure to follow Uber policy on the part of a handful of drivers among billions of rides—which does not identify a systemic inadequacy in Uber's training. The Complaint fails to allege any facts indicating that Uber has a duty to train independent drivers and, if such a duty did exist, that there are systemic inadequacies in Uber's training—or indeed any facts about Uber's training at all.

12

13

At best, the Complaint offers instances of drivers not complying with Uber policies as conclusory proof that Uber must not have trained them to proficiency. While not a pattern or practice case because the Title II action was brought by an individual, *Goodwin v. Marin County Transit District*, 675 F. Supp. 3d 1016, 1024 (N.D. Cal. 2022), is instructive. There, the plaintiff alleged that he was asked for documentation for his service animal in violation of the ADA while riding county transit buses. The court found it plausible to infer on a motion to dismiss that the transit authority failed to adequately train bus drivers because they asked for documentation during 30% of the relevant rides and the transit authority lacked a policy to the contrary. Here, unlike *Goodwin*, the Complaint identifies nowhere near the 30 percent of relevant rides sufficient to plausibly allege a failure to train, and Uber has express policies prohibiting the conduct at issue. *See* Ex. 1. The Complaint's factual allegations even state that drivers *are* aware they are required to transport riders with service animals and wheelchairs. *See* Compl. ¶ 54 (driver denying transport because of service animal and stating "he did not care if Uber suspended him from its platform as

25

26

27

28

---

[8] Service representatives are agents of Uber, whereas drivers are independent. *See infra* Section IV.C.

a result"); *id.* ¶ 82 (driver said "he did not care" about the rider's rights and Uber's policies); *id.* ¶ 132 (driver picked up rider with service animal and yelled during the drive about it being "unfair" they had to transport the service animal).

As for service representative training, the Complaint does not contain any factual allegations about service representatives failing to follow Uber policy, let alone enough to show a systemic inadequacy in Uber's training. That some individuals were dissatisfied with the outcome they received from requesting a fee adjustment, refund, or making a complaint, *see, e.g.*, Compl. ¶¶ 74, 143-144, 158-159, 208, does not adequately allege a systemic failure.[9]

> ### 4.    Some riders not receiving their preferred outcomes does not plausibly allege a pattern or practice of inequitable complaint procedures.

The government's theory that Uber has a pattern or practice of "[f]ailing to adopt complaint procedures that provide for the prompt and equitable resolution of complaints alleging disability discrimination, including prompt communication of the entity's response and reasoning for its response to each complainant," in violation of 49 C.F.R. § 37.17(b) and 42 U.S.C. § 12184(a), Compl. ¶ 297(h), fails because the government does not identify a single inadequate or absent complaint procedure. None of the remaining complaint-related allegations plausibly alleges that Uber has a pattern or practice of violating 49 C.F.R. § 37.17(b).

The Complaint does not allege that Uber violated the plain language of 49 C.F.R. § 37.17(b), which requires that "[a]n entity shall adopt procedures that incorporate appropriate due process standards and provide for the prompt and equitable resolution of complaints alleging any

---

[9] The Complaint's failure to identify any systemic shortcomings in Uber's training is telling. As Uber will show, the government has admitted that training on par with Uber's satisfies the ADA. In its settlement agreement with Uber's competitor, Lyft, the government confirmed that adequate training for drivers consists of providing new drivers with the relevant policy by email, regular communications to all drivers regarding the policy, and providing educational tools for drivers. Ex. 6 ¶ 28 (Settlement Agreement Under the Americans with Disabilities Act Between the United States of America and Lyft, Inc., *available at* https://tinyurl.com/32x4eb2d). As for service representatives, the government confirmed yearly training of employees tasked with processing complaints on the relevant policy satisfies the ADA. *Id.* ¶ 30.

action prohibited by this part" and that "[t]he procedures shall meet the following requirements":

The process for filing a complaint must be available to the public, accessible to and usable by individuals with disabilities, and "[t]he entity must promptly communicate its response to the complaint allegations, including its reasons for the response, to the complainant and must ensure that it has documented its response." The Complaint does not allege that Uber did not "promptly communicate its response" or "its reasons for the response" to the complainants. Nor does the Complaint identify any aspect of Uber's complaint-handling procedures that do not comply with the regulation, or any complaint-handling procedures that Uber failed to adopt.

Instead, the government alleges dissatisfaction with complaint outcomes. But 49 C.F.R. § 37.17(b) requires equitable "*procedures* that incorporate appropriate due process standards," 49 C.F.R. § 37.17(b) (emphasis added); it does not require that individuals receive their preferred outcomes, *see, e.g.*, *Nat'l Collegiate Preparatory v. D.C. Charter Sch. Bd.*, 2019 WL 7344826, at *3 (D.D.C. Dec. 11, 2019) (due process requires "distinguish[ing] between outcomes and procedures" and due process "does not protect any particular outcome; instead, it merely ensures that the procedures that led to such outcome are fair"). And even if it did, the Complaint's only allegations about outcomes are that in a few instances, riders were not satisfied with the outcome of their complaint. *See* Compl. ¶¶ 63, 74, 143-144, 158-159, 208, 279, 280.

Without any allegations about Uber's complaint procedures, the Complaint has not plausibly alleged any pattern or practice that Uber's complaint procedures violate 49 C.F.R. § 37.17(b). And none of the remaining complaint-related assertions plausibly allege a violation of 49 C.F.R. § 37.17(b) or evidence to support the inference that violating 49 C.F.R. § 37.17(b) is Uber's "standard operating procedure." *Teamsters*, 431 U.S. at 336.

*First*, the government's suggestion that the only "equitable" resolution of complaints requires immediately removing drivers from the platform after a discrimination complaint has been filed or "otherwise effectively penalizing or training" drivers to prevent future discrimination is not based on any legal authority. Compl. ¶ 279. As explained, 49 C.F.R. § 37.17(b) does not require any specific consequence to be imposed in response to complaints (even those that are determined

to be bona fide).[10] Even if it did, the factual allegations in the Complaint do not support that Uber's complaint-resolution procedures constitute any kind of discriminatory pattern or practice. For example, the Complaint alleges that two individuals filed complaints but that this "has not stopped continued discrimination," Compl. ¶¶ 63, 262, and that one individual filed a complaint but that "all three drivers continued to drive for Uber," *id.* ¶ 109. But these allegations of drivers not immediately removed from the platform do not constitute a pattern or practice of failing to adopt equitable complaint procedures. As the Complaint admits, Uber "enforces its community guidelines by, among other things, investigating complaints of violations and temporarily or permanently banning drivers and riders from Uber's services when its community guidelines or the law have been violated." *Id.* ¶ 43.

*Second*, the Complaint's allegations that four individuals were dissatisfied with the amount of account credits they received in response to complaints, Compl. ¶¶ 74, 143-144, 158-159, 208; *see also id.* ¶ 280, does not plausibly allege that Uber has a pattern or practice of violating 49 C.F.R. § 37.17(b). Again, 49 C.F.R. § 37.17(b) requires equitable procedures, not specific outcomes, let alone credits or credits in any specific amount.

*Finally*, the Complaint's allegation that one individual "believes it is important that he be given an opportunity to counter any claims the driver may make," Compl. ¶ 73, does not plausibly allege that Uber has a pattern or practice of violating 49 C.F.R. § 37.17(b). Section § 37.17(b) does not require an adversarial procedure, or that complainants have the opportunity to review details of an investigation. And one individual's perspective on how the process could be improved, while valued by Uber as it values feedback from all riders, does not allege a pattern or practice of failing to adopt adequate complaint procedures.

---

[10] Indeed, some state regulations prohibit Uber from immediately removing drivers from the platform without process. *See, e.g.*, RCW 49.46.300.

**5.    A few drivers refusing an individual's request to sit in the front seat or Uber capping refunds do not plausibly allege a pattern or practice of Uber failing to make reasonable modifications.**

Each of the two alleged bases for the government's "reasonable modifications" theory—denied front seat requests and capped refunds—fails to state a claim, and each for the same reason: neither plausibly alleges conduct by Uber or sufficiently systemic conduct to suggest a pattern or practice. Compl. ¶ 297(i) (citing 42 U.S.C. §§ 12184(a), (b)(2)(A), 49 C.F.R. § 37.5(f), 28 C.F.R. § 36.302).[11]

The Complaint identifies two supposed violations: *first*, that some drivers have refused an individual's requests to sit in the front passenger seat, Compl. ¶¶ 265-268, and, *second*, that Uber's generally applicable fee cap policy (which does not apply to refunds or appeasements for service denials) could theoretically prevent a rider who has received credits for discriminatory service denials from receiving additional fare adjustments, *id.* ¶¶ 269-273. Neither identifies a pattern or practice by Uber of refusing to make reasonable modifications.

As to the former, a few instances where a driver has refused an individual's request to sit in the front passenger seat does not state a pattern or practice by Uber of refusing reasonable accommodations. As explained above, such scant anecdotal allegations are not sufficient unless accompanied by allegations about the existence of a discriminatory corporate-level policy—entirely lacking here. *See supra* at Section IV.B.1.

---

[11] 49 C.F.R. § 37.5(f) explains that a private entity's obligation not to discriminate under 42 U.S.C. § 12184 includes "making reasonable modifications" as specified in 28 C.F.R. § 36.302, which provides that an entity "shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations." 28 C.F.R. § 36.302(a). 28 C.F.R. § 36.302 also includes provisions specific to reasonably modifying policies for service animals. 28 C.F.R. § 36.302(c).

And as to the latter, the government's allegations regarding fee caps are insufficient to state a pattern or practice by Uber of refusing to make reasonable modifications because the Complaint does not sufficiently allege that the cap policy results in individuals with disabilities being denied refunds or fare adjustments that would not also be denied to riders without disabilities. *See Szwanek v. Jack in the Box, Inc.*, 2021 WL 5104372, at *1 (9th Cir. Nov. 3, 2021) (facially neutral policy discriminates based on disability "only if it burdens the plaintiff in [a] manner different and greater than it burdens others"). Indeed it cannot make such allegations because Uber does not count refunds related to service denials towards the fee cap. The only example in the Complaint where an individual was allegedly denied a fare adjustment as a result of the cap policy was related to the rider's complaint about being charged for a longer route than expected, not a fare adjustment for a service-animal-related fee. *See* Compl. ¶¶ 240-241. The ADA does not require Uber to provide limitless refunds to people with disabilities for reasons unrelated to their disability.

6. **The same allegations that fail to state other ADA violations cannot plausibly allege a catchall ADA violation based on the same conduct.**

The Complaint also alleges vaguely that Uber has a pattern or practice of "[d]enying full and equal access to individuals with disabilities in violation of 42 U.S.C. § 12184(a); *see also* 49 C.F.R. § 37.5(f)." Compl. ¶ 297(a). Insofar as this theory includes the allegations of service denials, as explained above, those allegations identify only conduct *by drivers* that violate express Uber policies, which cannot support a pattern or practice claim against *Uber*. Otherwise, this theory incorporates by cross-reference regulations that are duplicative of the reasonable modifications and surcharges categories and fails for the same reasons discussed above. *See, e.g.*, *Disabled in Action of Pa.*, 418 F. Supp. 2d at 658 n.3 (ADA's broad nondiscrimination requirements do not impose "implicit[]" obligations "beyond those required" by "the plain language" of directly applicable rules).

1
2

### C.    The Government Fails To Plausibly Allege That Uber Is Liable For Individual Drivers' Discrimination In Violation Of 42 U.S.C. § 12188(b)(1)(B)(ii)

3    The government has not plausibly alleged that Uber is liable for discrimination under 42
4    U.S.C. § 12188(b)(1)(B)(ii) either. To state a claim under § 12188(b)(1)(B)(ii), the Complaint must
5    plausibly allege that Uber is liable for discrimination under the ADA "and such discrimination
6    raises an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B). "[W]hile the Attorney
7    General's determination of general public importance cannot be reviewed … , the complaint still
8    must plead facts that, taken as true, plausibly demonstrate that [Uber] violated the ADA
9    commensurate with what the Attorney General has found to be of general public importance."
10    *Fitness Int'l*, 2025 WL 2093424, at *6. Put simply, the government must still plausibly allege that
11    Uber has violated the ADA. It has not.

12    To the extent the government grounds this claim on allegations that Uber has violated the
13    ADA based on a supposed pattern or practice of discrimination, this claim fails for the same
14    reasons as the pattern or practice claim. *See supra* Section IV.B.

15    In the absence of a pattern or practice by Uber, the only discrimination alleged in the
16    Complaint is a handful of instances by individual independent drivers, which the government
17    attempts to aggregate and for which the Complaint seeks to hold Uber vicariously liable. Yet the
18    Complaint acknowledges the service denials were strictly carried out by drivers, sometimes after
19    verbally confirming knowledge of Uber's policies forbidding such conduct. *See, e.g.*, Compl.
20    ¶¶ 54, 82, 97-100, 132. For example, after referring to drivers' refusals to pick up one rider and
21    his service dog, the Complaint refers to the refusals as "Uber's discrimination." *Id.* ¶ 61. The
22    government repeatedly claims that this is "Uber's" discrimination even while recognizing that one
23    driver said he "did not care if Uber suspended him from its platform" for denying service. *Id.* ¶ 54.
24    Despite recognizing that in some instances a handful of drivers have independently denied service
25    while explicitly flouting Uber's policies, *see id.* ¶¶ 79-83, the government implausibly
26    characterizes such conduct as "Uber's discrimination." *Id.* ¶ 89.

27
28

The government's vicarious liability theory fails. Uber cannot be held vicariously liable for the actions of independent drivers alleged in the Complaint because there are no allegations in the complaint that any of the conduct is within the scope of any arguable agency or employment. "As a general rule, an entity is not held vicariously liable for actions taken by an independent contractor." *Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 170 (D.D.C. 2014) (ADA lawsuit against the District of Columbia and contractors operating the District's homeless shelters). Drivers cannot be acting within a scope of agency or employment and Uber cannot be held liable for their actions if drivers are not "employed" by Uber. As the Complaint's allegations of drivers denying service in contravention to Uber's policies demonstrate, Compl. ¶¶ 54, 79-83, Uber cannot control drivers' actions and therefore cannot control their compliance with the ADA.

But to conclude that Uber is not vicariously liable for the actions of drivers alleged in the Compliant, the Court need not resolve whether drivers are independent contractors or employees. Applying the traditional rules of vicarious liability, as courts must in an ADA case, the Complaint fails to allege the necessary relationship to hold Uber liable for drivers' actions. *United States v. Town of Colorado City*, 935 F.3d 804, 808 (9th Cir. 2019) (respondeat superior applies in civil rights actions); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (respondeat superior applies to claims brought pursuant to Title II of the ADA) , *as amended on denial of reh'g* (Oct. 11, 2001); *Buckner v. Omnimed Medical Servs. Corp.*, 2023 WL 12144750, at *4 (C.D. Cal. July 26, 2023) (applying federal common law of agency to Title I claim); *see also Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017) ("The federal common law of agency has frequently been derived from the Restatement of Agency.").

To hold Uber liable for drivers' actions, drivers must have acted within the scope of their authority. *See Ringcentral, Inc. v. Nextiva, Inc.*, 2021 WL 2476879, at *10-11 (N.D. Cal. June 17, 2021). Agents act within the scope of their authority only when "'actuated, at least in part, by a purpose to serve the [principal],' even if it is forbidden by the [principal]." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) (quoting Restatement (Second) Agency §§ 228(1)(c), 230); *see also United States v. Beusch*, 596 F.2d 871, 877 (9th Cir. 1979) ("The acts of an agent may be

imputed to the principal, but only if it is the agent's purpose to benefit the principal, thus bringing his acts within the scope of his employment." (citations omitted)). Here, the Complaint does not allege any intent to benefit Uber when a driver denies service or equal treatment to a rider with a service animal or wheelchair, when a driver imposes an improper cleaning fee, or when a driver is verbally offensive to a rider with a service animal or wheelchair, all in direct violation of Uber's policies. *Cf. SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016) (vicarious liability theory survived motion to dismiss because allegedly unlawful misappropriations were "intended, at least in part, to benefit [the employer] through additional customers and sales"). Nor can the government allege any plausible benefit to Uber in drivers denying service that results in lost potential revenue for Uber, in requests for improper cleaning fees that go directly to the driver and would be undone once a review is requested, or in having drivers turn riders against Uber and away from using the company's apps and platform.

Accordingly, because the government has not adequately alleged a pattern or practice by Uber or that Uber is vicariously liable for the collective discrimination by a handful of individual drivers, the government cannot state a claim under 42 U.S.C. § 12188(b)(1)(B)(ii). *See Fitness Int'l*, 2025 WL 2093424, at *6 ("the complaint still must plead facts that, taken as true, plausibly demonstrate that Defendant violated the ADA commensurate with what the Attorney General has found to be of general public importance").

## CONCLUSION

The government's complaint is fundamentally misconceived: It sues Uber under a statute that does not apply to it, based on discrete instances of driver noncompliance with Uber's express policy. Because no additional or different factual allegations could cure these fatal conceptual defects at the heart of the government's case, the United States' complaint against Uber should be dismissed with prejudice.

Dated: January 23, 2026                    Respectfully submitted,


                                          */s/ Benjamin J. Yood*
                                          Benjamin J. Yood (SBN 301688)
                                          jamie.yood@wilmerhale.com
                                          WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                          2100 Pennsylvania Avenue N.W.
                                          Washington, DC 20037
                                          Telephone: (202) 663-6695
                                          Facsimile: (202) 663-6363

                                          Alan E. Schoenfeld (*pro hac vice* forthcoming)
                                          alan.schoenfeld@wilmerhale.com
                                          WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                          7 World Trade Center
                                          250 Greenwich Street
                                          New York, NY 10007
                                          Telephone: (212) 937-7294
                                          Facsimile: (212) 230-8888

                                          *Attorneys for Defendant*
                                          *Uber Technologies, Inc.*