HARMEET K. DHILLON, Assistant Attorney General (CABN 207873)
R. JONAS A. GEISSLER, Deputy Assistant Attorney General (NJBN 025752001)
KEVIN J. KIJEWSKI, Deputy Chief (IL ARDC 6226876)
JANE E. ANDERSEN, Trial Attorney (NYRN 4651519)
KATHERINE DUTCHER, Trial Attorney (CABN 313010)
DAVID W. KNIGHT, Trial Attorney (MDAN 0412140410)
U.S. Department of Justice
950 Pennsylvania Ave., N.W.- 4CON
Washington, DC 20530
Telephone: (202) 598-6580
jane.andersen2@usdoj.gov

CRAIG H. MISSAKIAN, United States Attorney (CABN 125202)
PAMELA T. JOHANN, Chief, Civil Division (CABN 145558)
MICHAEL A. KEOUGH, Assistant United States Attorney (NYRN 5199666)
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
Telephone: (510) 637-3721
Facsimile: (510) 637-3724
michael.keough@usdoj.gov

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 25-CV-07731-SK |
| Plaintiff, | ) **UNITED STATES' OPPOSITION TO UBER'S** |
| v. | ) **MOTION TO DISMISS THE COMPLAINT** |
| UBER TECHNOLOGIES, INC, | ) Hearing Date: March 9, 2026 |
| Defendant. | ) Time: 9:30 a.m. |
|  | ) Place: Courtroom C – 15th Floor |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF THE ISSUES TO BE DECIDED..........................................2

III.  FACTUAL BACKGROUND ................................................................................2

IV.   LEGAL FRAMEWORK ......................................................................................4

      A.  ADA's Prohibition Of Discrimination In Transportation Services ...........4

      B.  Pleadings Standard.....................................................................................5

V.    ARGUMENT ........................................................................................................6

      A.  Uber's Effort To Evade ADA Coverage By Denying That It Is A Transportation Company Contradicts The ADA And The Complaint's Allegations. .................................................................................................6

      B.  The United States Has Met Its Burden of Pleading That Uber Is Engaging in a Pattern or Practice of Discrimination........................................................10

          1.  The Complaint plausibly alleges that Uber is engaging in a pattern or practice of disability-based discrimination. ........................................11

          2.  Uber incorrectly asks the Court to require statistical evidence of discrimination. ..........................................................................................14

          3.  The Court should view all factual allegations of unequal service together. .....................16

          4.  Charging a cancellation fee or cleaning fee because of a person's disability violates the ADA........................................................................17

          5.  Uber maintains an affirmative obligation to comply with training and complaint procedure regulations..............................................................19

      C.  Uber Is Not Only Directly Liable Under the ADA It Is Otherwise Vicariously Liable For Its Drivers' Actions. .............................................21

VI.   CONCLUSION....................................................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Access Living of Metro. Chi. v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141
(N.D. Ill. 2018)...................................................................................................... 8

4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 5

5

*Austin v. Univ. of Or.*, 925 F.3d 1133 (9th Cir. 2019) ............................................ 10

6

*Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012) .................... 16

7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................... 6, 9, 10

8

*Bischoff v. Brittain*, 183 F. Supp. 3d 1080 (E.D. Cal. 2016) ................................. 24

9

*Bonner v. Lewis* 857 F.2d 559 (9th Cir. 1988)................................................. 22, 23

10

*Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998)........................................... 22, 23

11

*Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003) ........................................ 10

12

*Cleveland v. Caplaw Enterprises.*, 448 F.3d 518 (2d Cir. 2006)........................ 23, 24

13

*Crawford v. Uber Techs., Inc.*, 2018 WL 1116725 (N.D. Cal. Mar. 1,
2018) ................................................................................................................. 8, 9

14

*Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2021 WL 3810259
(N.D. Cal. Aug. 26, 2021).................................................................................... 7

15

16

*Disabled in Action of PA. v. Nat'l Passenger R.R. Corp.*, 418 F. Supp. 2d
652 (E.D. Pa. 2005)........................................................................................... 17

17

*Doe v. Sterling*, No. 2:23-CV-10061-RAO, 2025 WL 3724625 (C.D. Cal.
Dec. 19, 2025).................................................................................................... 24

18

19

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ...................................... 22

20

*EEOC v. Glob. Horizons, Inc.*, 904 F. Supp. 2d 1074 (D. Haw. 2012) ............ 10, 15

21

*Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62 (D.D.C. 2021) ....... 7, 8, 23

22

*Husayn v. Mitchell*, 142 F.4th 667 (9th Cir. 2025)................................................. 23

23

*Indep. Living Res. Ctr. S. F. v. Lyft, Inc.*, No. C 19-01438 WHA, 2020 WL
6462390 (N.D. Cal. Nov. 3, 2020)....................................................................... 7

24

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324
(1977) ............................................................................................................. 10, 14

25

26

*James v. Peter Pan Transit Mgmt., Inc.*, No. 5:97-CV-747, 1999 WL
735173 (E.D.N.C. Jan. 20, 1999)....................................................................... 19

27

*Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093 (9th Cir. 2020) ....................... 9

28

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ............................................ 6

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) .............................................................................. 24

*Lowell v. Lyft, Inc.*, No. 17-cv-06251 (PMH), 2024 WL 4350159
    (S.D.N.Y. Sep. 30, 2024) ........................................................................................................ 19

*Merritt v. Barclays PLC*, No. 2:23-CV-09217-MEMF-KS, 2025 WL
    1906688 (C.D. Cal. July 10, 2025) ........................................................................................ 15

*Meyer v. Holley*, 537 U.S. 280 (2003) ................................................................................... 22, 23

*Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136 (N.D. Cal. 2020) ...................................... 8

*O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133 (N.D. Cal. 2015) .................................... 7, 9

*O'Hanlon v. Uber Techs., Inc.*, No. 2:19-CV-00675, 2021 WL 2415073
    (W.D. Pa. June 14, 2021) ......................................................................................................... 8

*Obrey v. Johnson,* 400 F.3d 691 (9th Cir. 2005) ........................................................................... 15

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001) ........................................................................ 1, 8

*Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL 758087
    (W.D. Tex. Feb. 20, 2015) ....................................................................................................... 8

*Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) ................................................................... 12

*Stamm v. N.Y.C. Transit Auth.*, No. 04-CV-2163 SLT JMA, 2011 WL
    1315935 (E.D.N.Y. Mar. 30, 2011) ....................................................................................... 19

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ................................................................................. 5

*United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984 (9th Cir.
    2011) .................................................................................................................................... 6, 15

*United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992) ........................................................... 10

*United States v. City of N.Y.*, 713 F. Supp. 2d 300, 323 (S.D.N.Y. 2010) ............................ 11, 14

*United States v. City of Philadelphia.*, 838 F. Supp. 223 (E.D. Pa. 1993) .................................. 21

*United States v. Fitness Int'l, LLC*, No. 8:24-cv-02172-SVW-KES, 2025
    WL 2093424 (C.D. Cal. June 6, 2025) ...................................................................... 14, 15, 21

*United States v. Garden Homes Mgmt., Corp.*, 156 F. Supp. 2d 413
    (D.N.J. 2001) ...................................................................................................................... 10, 11

*United States v. Mintzes*, 304 F. Supp. 1305 (D. Md. 1969) ........................................................ 11

*United States v. Nobel Learning Cmtys., Inc.*, 676 F. Supp. 2d 379 (E.D.
    Pa. 2009) ............................................................................................................................. 10, 11

*United States v. Northside Realty Assocs.*, 474 F.2d 1164 (5th Cir. 1973) ................................. 21

*United States v. Northside Realty Assocs.*, F.2d 181 (5th Cir. 1974) .......................................... 21

*United States v. Prashad*, 437 F. Supp. 3d 105 (D. Mass. 2020) ........................................... 10

*United States v. Taigen & Sons, Inc.*, 303 F. Supp. 2d 1129 (D. Idaho 2003) ....................................................................................................................... 21

*United States v. Town of Colo. City*, 935 F.3d 804 (9th Cir. 2019) ........................................ 10

*United States v. Uber*, No. 3:21-cv-08735 (N.D. Cal. Apr. 13, 2022) .................................... 8

*United States v. West Peachtree Tenth Corp.*, 437 F.2d 221 (5th Cir. 1971) ......................... 11

*United States v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276 (S.D.N.Y.1985) ........................... 21

*Vance v. Ball State Univ.*, 570 U.S. 421 (2013) ..................................................................... 22

## STATUTES

42 U.S.C. § 12101 ...................................................................................................................... 1

42 U.S.C. § 12181 ...................................................................................................................... 4

42 U.S.C. § 12184 ............................................................................................................... passim

42 U.S.C. § 12186 ...................................................................................................................... 4

42 U.S.C. § 12188 .................................................................................................................... 21

## OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024) .................................................................................. 22

Restatement (Second) of Agency § 1 (1958) ........................................................................... 23

Restatement (Second) of Agency § 219 (1958) ....................................................................... 22

Restatement (Second) of Agency § 229 (1958) ....................................................................... 22

Restatement (Second) of Agency § 230 (1958) ....................................................................... 23

Restatement (Third) of Agency § 1.01 (2006) ......................................................................... 23

Restatement (Third) of Agency § 7.08 (2006) ......................................................................... 22

## RULES

Fed. R. Civ. P. 15 ..................................................................................................................... 29

Fed. R. Civ. P. 8 ....................................................................................................................... 11

Fed. R. Evid. 408 ...................................................................................................................... 23

## REGULATIONS

28 C.F.R. § 35.136 .................................................................................................................... 20

28 C.F.R. § 36.301 ...................................................................................................................... 5

28 C.F.R. § 36.302 ................................................................................................ 5, 17

28 C.F.R. §§ 36.301-36.306 ....................................................................................... 4

49 C.F.R. pt. 37 ........................................................................................................... 4

49 C.F.R. § 37.3 ...................................................................................................... 4, 5

49 C.F.R. § 37.5 ........................................................................................... 4, 5, 17, 18

49 C.F.R. § 37.17 .................................................................................................. 5, 20

49 C.F.R. § 37.29 .................................................................................................. 5, 18

49 C.F.R. § 37.37 ......................................................................................................... 7

49 C.F.R. § 37.167 ....................................................................................................... 5

49 C.F.R. § 37.173 ................................................................................................ 5, 19

Plaintiff United States of America respectfully submits this opposition to Uber's Motion to Dismiss (Dkt. 17) the United States' Complaint (Dkt. 1).

## I.    **INTRODUCTION**

The Americans with Disabilities Act's (ADA's) purpose is to "remedy widespread discrimination" against people with disabilities. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). In passing the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination" in "critical areas" including "transportation." 42 U.S.C. § 12101(a)(3), (5). The United States brings this lawsuit to remedy the widespread discrimination faced by people with disabilities while using Uber's transportation services.

Uber provides demand-responsive transportation in the United States, and many individuals with disabilities rely on Uber's services to meet their transportation needs—including to travel to work, medical appointments, religious services, and other important places. Despite the importance of its services to people with disabilities, Uber denies hundreds, if not thousands, of people with disabilities full and equal enjoyment of its transportation services by routinely refusing to serve individuals who use service animals or mobility devices; imposing impermissible surcharges by charging cleaning fees for service animal shedding and cancellation fees to riders whom Uber has unlawfully denied service; and refusing to reasonably modify Uber's policies, practices, or procedures where necessary to avoid discriminating against riders with disabilities. Uber is aware of—but fails to prevent and remedy—its widespread discrimination.

Uber now seeks to dismiss the Complaint. First, Uber seeks to avoid liability by claiming that it is not actually engaged in the transportation business and therefore not covered under the ADA. Several district courts, including courts in this district, have already rejected soundly this argument. And, the well-pleaded facts show that Uber is a transportation business. Second, Uber argues the United States has failed to plead a pattern or practice of disability-based discrimination even though the Complaint alleges that Uber has discriminated against hundreds of people throughout the United States, including many who are routinely denied rides because of their disabilities—sometimes in back-to-back incidents by Uber drivers. Uber's mischaracterization of the facts must be rejected. Finally, Uber argues that if the Court finds Uber cannot be held directly liable under the ADA, then it also cannot be vicariously liable for what

Uber says are isolated instances of discrimination caused by its drivers. Uber is wrong. Because drivers are acting as Uber's agents relevant to the allegations in the Complaint, vicarious liability applies even if there were no direct ADA liability. Because the United States' Complaint plainly alleges facts showing that Uber has violated, and continues to violate, the ADA, the Court should deny Uber's motion.

## II.    STATEMENT OF THE ISSUES TO BE DECIDED

A.    Whether the Complaint plausibly alleges that Uber is a transportation company covered under Title III of the ADA.

B.    Whether the Complaint plausibly alleges that Uber is engaging in a pattern or practice of discrimination by failing to provide full and equal enjoyment of its transportation services to people with disabilities in violation of Title III of the ADA.

C.    Whether Uber can be directly liable under the Attorney General's authority to prosecute cases that are a matter of general public importance, and otherwise vicariously liable for discrimination carried out by its drivers.

## III.    FACTUAL BACKGROUND

Uber provides demand-responsive transportation services. *See* Compl. ¶ 30. Uber operates a transportation system that connects drivers with riders, so that passengers request a car and driver to take them places using Uber's mobile software application (app) and Uber arranges rides between passengers and a fleet of drivers approved by Uber. *See id.* ¶¶ 30-31. Uber operates its transportation services in towns, cities, and regions of its choosing. *See id.* ¶ 32. Uber exercises control over its cars, drivers, ride experience, and fee structures. *See id.* ¶¶ 34-36, 39, 41-43. For example, Uber controls each trip by setting and enforcing: vehicle specifications; driver training requirements, qualifications, and incentive programs; driver behavior expectations; location tracking; the general ride experience for each trip; and the pricing structure for each trip, including minimum fares, rates for the mileage and time it takes to drive from the pick-up point to the destination, surcharges, marketplace fees, and when fees may be charged for cleaning or ride cancellations. *See id.* ¶¶ 34-36, 41. Uber permits riders to report driver misconduct and to rate driver performance. *See id.* ¶ 42. Uber has the ability to enforce its community guidelines by, among other things, investigating complaints of violations and temporarily or permanently banning drivers and riders from Uber's services when its community guidelines or the law have been violated. *See id.* ¶ 43.

Uber has discriminated against the hundreds of individuals with disabilities alleged in the Complaint; not just the seventeen illustrative examples identified in the Complaint.  *See id.* ¶ 49.  Uber frequently denies rides to people with disabilities throughout the United States because of their service animals, stowable wheelchairs, or because their appearance or involuntary behavior resulting from their disabilities may offend, annoy, or inconvenience Uber's drivers.  *See id.* ¶¶ 47, 51, 65, 125, 164, 187, 216, 239, 247.  Riders sometimes experience back-to-back ride denials from Uber drivers, sometimes being denied three or four times in a row.  *See id.* ¶¶ 96-108, 126, 136, 174-181, 189, 237, 248.  Valerie Hyatt used Uber about nineteen times in October 2024 and Uber denies her rides at least four of those times after the driver learned she was traveling with a service animal.  *See id.* ¶ 145.  Julie Tamez was *not* using a guide dog between May 2023 and April 2025, and during this time never had an Uber driver arrive at her pickup location and then deny her service.  In contrast, between April 2025 and September 2025, Ms. Tamez was using a guide dog and experienced at least fifteen ride denials because of her service animal while attempting to use Uber.  *See id.* ¶¶ 130-131.  Ryan Honick has also experienced Uber's ride denials only while traveling with his service animals.  *See id.* ¶ 187.

When Uber does not outright deny service to individuals with disabilities, it often discriminates against them in other ways.  Riders with disabilities often must confront or persuade Uber drivers to provide them with service.  *See id.* ¶¶ 52, 60, 82, 141, 168, 209, 219.  Uber drivers unlawfully impose disability-related surcharges, including cleaning fees related to their service animals.  *See id.* ¶¶ 169, 192.  Individuals have been asked to muzzle their guide dog or place the guide dog in the trunk.  *See id.* ¶ 129.  And Uber has refused to reasonably accommodate riders' disability-related needs.  *See id.* ¶¶ 239-241, 257-260.  For example, many Uber drivers have denied Ms. Lawrence's request to sit in the front passenger seat as a reasonable modification for her disability because her prosthetic leg does not bend.  *See id.* ¶¶ 266-267.  And Uber has failed to reasonably modify policies to prevent discrimination.  *See id.* ¶¶ 271-273.

Uber drivers have incorrectly told individuals who use service animals that they must use Uber Pet, which costs more money.  *See id.* ¶¶ 59, 105, 166.  Other Uber drivers have insisted they are not obligated by the law or Uber's policy to accept service dogs.  *See id.* ¶ 140.  Other Uber drivers have

demanded the "dog's papers." *See id.* ¶ 177. And other Uber drivers have incorrectly stated they are not permitted to assist with stowing a wheelchair. *See id.* ¶ 218.

Many individuals with disabilities avoid using Uber when possible because of the discrimination they experience, even when it costs them more money. *See id.* ¶¶ 65, 66, 92, 160, 184, 229. Riders with disabilities build in additional time to their travel plan in anticipation of being denied a ride because of discrimination. *See id.* ¶¶ 67, 146, 197, 243, 246. And other individuals will sometimes make the difficult choice to travel without their guide dog to avoid discrimination by Uber. *See id.* ¶¶ 88, 184,195, 242, 264. Uber's discriminatory conduct has caused significate economic, emotional, and physical harm to individuals with disabilities. *See id.* ¶ 11.

Uber receives thousands of complaints from riders each year alleging disability-based discrimination. *See id.* ¶ 48. Riders are not told the results of Uber's investigation. *See id.* ¶¶ 63, 73. And outright discriminating against a person with a disability does not always result in the Uber driver being prohibited from driving for Uber. *See id.* ¶¶ 95-109. Many riders have stopped filing complaints with Uber because they do not believe they receive a meaningful response and have not seen improvements with Uber's services. *See id.* ¶ 281.

### IV.    LEGAL FRAMEWORK

#### A.    ADA's Prohibition Of Discrimination In Transportation Services

Section 12184 of Title III prohibits discrimination "on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). The term "specified public transportation" is broadly defined as transportation by any "conveyance" (other than aircraft) "that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10); *accord* 49 C.F.R. § 37.3. Congress charged the Secretary of Transportation with promulgating regulations to implement the transportation provisions of the ADA, including for Title III. 42 U.S.C. § 12186. Under this mandate, the United States Department of Transportation (DOT) promulgated 49 C.F.R. pt. 37. The DOT regulation incorporates DOJ's Title III regulation provisions found at 28 C.F.R. §§ 36.301-36.306. 49 C.F.R. § 37.5.

Under the DOT regulation, discrimination is defined broadly and includes a prohibition on denying an individual with a disability the opportunity to use the entity's transportation service, if the individual is capable of using that service. 49 C.F.R. §§ 37.5, 37.29(c). Discrimination includes the refusal to provide service because of appearance or involuntary behavior of an individual with disabilities, when the individual is not engaging in violent, seriously disruptive, or illegal conduct, or conduct that endangers health or safety of others. 49 C.F.R. § 37.5(h). And discrimination includes the imposition of additional fees or surcharges on passengers with disabilities. *Id.* § 37.5(d); 28 C.F.R. § 36.301(c) (incorporated by 49 C.F.R. § 37.5(f)). Private entities that provide transportation services must "permit service animals to accompany individuals with disabilities in vehicles." *Id.* § 37.167(d). Private entities providing taxi services must not "refus[e] to assist with the stowing of mobility devices." *Id.* § 37.29(c). And they must reasonably modify their policies, practices, or procedures when necessary to avoid discrimination, unless they can show that such modifications would fundamentally alter the nature of their services. 42 U.S.C. § 12184(b)(2)(A); 28 C.F.R. § 36.302(a) (incorporated by 49 C.F.R. § 37.5(f)).

To prevent discrimination, all entities providing demand-responsive[1] transportation services "shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they . . . properly assist and treat individuals with disabilities who use the service in a respectful and courteous way." 49 C.F.R. § 37.173. And they must adopt complaint procedures that provide for the prompt and equitable resolution of complaints alleging disability discrimination, including prompt communication of the entity's response and reasoning for its response to each complaint. *Id.* § 37.17(b).

## B. Pleadings Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Factual

---

[1] Demand-responsive system means any system of transporting individuals, including the provision of designated public transportation service by public entities and the provision of transportation service by private entities, including but not limited to specified public transportation service, which is not a fixed route system. 49 C.F.R. § 37.3.

allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On a motion to dismiss, the Court is generally limited to the four-corners of the pleading, but may take judicial notice of matters of public record, though not "of facts favorable to Defendants that could reasonably be disputed." *United States ex rel. Lee v. Corinthian Colls*., 655 F.3d 984, 999 (9th Cir. 2011). And even where a "document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018).

## V.    ARGUMENT

Accepting the United States' well-pleaded allegations as true and drawing reasonable inferences therefrom, the Complaint plausibly pleads that: (1) Uber is a covered entity under the ADA because it provides transportation services; (2) Uber is engaging in a pattern or practice of discrimination against riders with disabilities; and (3) Uber is direclty liable under the Attorney General's authority to prosecute matters of general public importance, and is otherwise vicariously liable for discrimination carrieed out by its drivers. In response, Uber's arguments rely on facts and inferences found nowhere in the Complaint and raise mixed questions of law and fact that cannot be decided on a motion to dismiss. Accordingly, the Court should deny Uber's Motion.

### A.    Uber's Effort To Evade ADA Coverage By Denying That It Is A Transportation Company Contradicts The ADA And The Complaint's Allegations.

The ADA governs private entities including Uber that are in the "business of transporting people" and whose operations affect commerce. 42 U.S.C. § 12184(a). Despite the Complaint's express allegation that Uber is "primarily engaged in the business of transporting people" and that Uber's business "involves calling for a car and a driver to take one places," Uber argues it is not a transportation company covered by the ADA. Mot. to Dismiss at 6-9. But, as Uber concedes, it has been unsuccessful in making this argument in other lawsuits. *Id.* at 9. In fact, this court and others have repeatedly and uniformly rejected this argument in cases against Uber and another entity providing the same type of transportation services, Lyft Inc.[2]

---

[2] Uber also argues that it is not *primarily* engaged in the business of transporting people because in addition

Every court to have addressed the issue has either found Uber or Lyft to be a provider of transportation services under the ADA at the summary judgment stage, or has denied Uber and Lyft's motions to dismiss at the pleadings stage, finding that ADA coverage is a mixed question of law and fact and that the respective complaints plausibly alleged that Uber and Lyft are providers of transportation services as defined under 42 U.S.C. § 12184(a).

First, a court in this district has previously found, as a matter of law, that Uber is a transportation company covered under Section 12184. *See Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2021 WL 3810259 (N.D. Cal. Aug. 26, 2021) ("*Crawford II*"). In *Crawford II,* this court rejected Uber's contention, made on summary judgment, that it "sells technology, not transportation," finding that "if Uber is a technology company, so must be Yellow Cab, which uses radio technology to dispatch its taxis, and John Deere, which uses robots to manufacture lawn mowers." 2021 WL 3810259 at *4 (citing *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D. Cal. 2015)). Instead, the court granted summary judgment to plaintiff on the issue, finding Uber to be a provider of transportation services based on undisputed facts, including that Uber "requires drivers to comply with state and local laws," "maintains behavioral expectations and enforces its community standards against drivers," and "sets, without input from drivers, the prices of rides." *Id*. at *5. The court also noted that it need not address Uber's contention that it does not "'stand in the shoes' of its drivers," holding that "Uber is a covered entity in its own right." *Id*. at *4 n.3. Similarly, a year earlier, another court in this district held that Lyft is covered under Section 12184. *Indep. Living Res. Ctr. S. F. v. Lyft, Inc.,* No. C 19-01438 WHA, 2020 WL 6462390, at *2 (N.D. Cal. Nov. 3, 2020).

Second, in ruling on motions to dismiss, courts in this and other districts have rejected Uber's argument that it is not covered under Section 12184. *See* Mot. to Dismiss; *United States v. Uber*, No.

---

to its rideshare services, it also offers services such as delivery and freight shipping. Mot. to Dismiss at 6. This is a strained argument at best and one that courts have likewise rejected. *See, e.g.*, *Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 85 (D.D.C. 2021) (rejecting Uber's contention in a motion to dismiss that it was not "primarily" engaged in transportation services). Even if Uber diversified its business to an extent that it was no longer primarily engaged in transportation services as a whole, the ridesharing part of its business would still need to comply with the ADA. *See* 49 C.F.R. § 37.37(f); *see also* Compl. ¶ 22 (directing the Complaint to any part of the business "responsible for Uber's provision of transportation services").

OPPOSITION TO MOTION TO DISMISS
CASE NO. 25-CV-07731-SK                7

3:21-cv-08735 (N.D. Cal. Apr. 13, 2022), ECF No.24, Min. Entry., ECF No. 34 (denying Uber's motion to dismiss); *O'Hanlon v. Uber Techs., Inc.*, No. 2:19-CV-00675, 2021 WL 2415073, at \*7-8 (W.D. Pa. June 14, 2021) (refusing to dismiss § 12184(a) claim against Uber); *Equal Rts. Ctr*, 525 F. Supp. 3d at 84-85 (denying Uber's motion to dismiss and finding plaintiff plausibly alleged that Uber is primarily engaged in transportation services); *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020) (denying Uber's motion to dismiss in part, and noting that "Uber's claim that it is 'not a transportation company' strains credulity, given the company *advertises itself* as a 'transportation system'") (emphasis in original); *Access Living of Metro. Chi. v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141, 1158-59 (N.D. Ill. 2018) (denying Uber's motion to dismiss an ADA claim because plaintiffs plausibly alleged that Uber was "primarily engaged in the business of transporting people"); *Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL 758087 at \*10 (W.D. Tex. Feb. 20, 2015) (same).  In denying Uber's motions, courts have rejected many of the same Uber arguments Uber makes here.

Uber's argument that it cannot be covered under the ADA because it does not own vehicles or actually transport anyone itself, *see* Mot. to Dismiss at 6, has been rejected.  In *Equal Rts. Ctr.*, the court addressed similar arguments made by Uber, and held that a private entity could "provide" transportation services without actually transporting people itself.  525 F. Supp. 3d at 84-85.  In *Ramos*, the court rejected Uber and Lyft's arguments that they are not subject to Section 12184 because they are "simply mobile-based ridesharing platforms to connect drivers and riders" and "do[] not own the vehicles drivers use or provide any transportation."  2015 WL 758087 at \*10.  In doing so, the Court noted that the Supreme Court has held that "the fact that the ADA 'can be applied in situations not expressly anticipated by Congress' demonstrates its breadth."  *Id.* (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001)).

Courts have likewise rejected Uber's recycled argument that it is merely a technology company[3] comparable to an online travel agency like Expedia.com.  Mot. to Dismiss at 7-9.  In *Crawford v. Uber Techs., Inc.*, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) ("*Crawford I*"), for example, in denying Uber's

---

[3] Uber cites to a redacted Opinion Letter issued by the U.S. Department of Labor's Wage and Hour Division as purported evidence that Uber is a "virtual market company."  Mot. to Dismiss at 2.  It is not clear on the face of the letter that it pertains to Uber and, even if it does, the letter is based on upon self-serving facts that are contradicted in the Complaint and is therefore improper to consider on a motion to dismiss.

motion for judgment on the pleadings, this court held that these arguments "miss the mark," describing Uber's analogy to Expedia.com as "a strained one." *Id.* at *4. There the court explained that "nothing in Section 12184 requires that an entity own or lease its own vehicles in order to qualify as a private entity providing taxi service within the meaning of the statute." *Id.* Moreover, the court found that Uber's level of control over its drivers presented "a mixed question of law and fact that cannot be determined on the pleadings." *Id.* (citing *O'Connor*, 82 F. Supp. 3d at 1133). Because plaintiffs "plausibly alleged that Uber is 'primarily engaged in the business of transporting people' within the meaning of Section 12184," the court rejected Uber's attempt to avoid the ADA. *Id.* Uber's assertion that each of the many court rulings on this issue was wrongly decided is meritless.[4]

Here, the United States clearly pleads that Uber is "a private entity primarily engaged in the business of transporting people" under Section 12184. Compl. ¶¶ 21-22, 24. That, alone, suffices to meet the notice pleading requirements of Federal Rule of Civil Procedure 8. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nevertheless, the United States' Complaint goes further, explaining the manner and frequency with which Uber provides transportation services. *See, e.g.*, Compl. ¶¶ 23-25, 30-31. The Complaint also alleges facts showing the level of control Uber exercises over its cars, drivers, ride experience, and fee structures. *See* Compl. ¶¶ 32-43. On a motion to dismiss, these facts must be accepted as true and construed in the light most favorable to the United States. *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020). Accordingly, even if Uber's characterization were correct—and even if every court to decide the issue has gotten it wrong—this would not support dismissal on the pleadings because Uber's coverage under the ADA presents a mixed question of law and fact that the Court cannot determine on the pleadings. Accordingly, Uber cannot meet its burden as movant and the Court should reject Uber's effort to evade the ADA.

---

[4] In arguing it is not a provider of transportation services, Uber also relies on cases that do not pertain to the ADA or the meaning of a "public transportation service" provider under Section 12184. Instead, these cases generally relate to entities that were not held liable under various state negligence laws because they lacked the requisite ownership, control, or possession of the subject properties. Mot. to Dismiss at 7-8. This is distinct from the present issue, in which courts have held that Uber need not own or lease its own vehicles to be covered under Section 12184. *See, e.g.*, *Crawford I*, 2018 WL 1116725 at *4.

**B.** **The United States Has Met Its Burden of Pleading That Uber Is Engaging In A Pattern Or Practice Of Discrimination**

The United States asserts that Uber is engaging in a pattern or practice of discrimination by failing to provide full and equal enjoyment of its transportation services to people with disabilities in violation of 42 U.S.C. § 12184. Because the phrase "pattern or practice" is not defined by statute, the phrase should be given its ordinary meaning. *Cherosky v. Henderson*, 330 F.3d 1243, 1246-47 (9th Cir. 2003). In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), the Supreme Court held that where the United States alleged a systemwide pattern or practice of employment discrimination, the United States "ultimately had to prove more than the mere occurrence of isolated or 'accidental' or sporadic discrimination acts" and that the discrimination was the "regular rather than the unusual practice." *Id.* at 336; *United States v. Nobel Learning Cmtys., Inc.*, 676 F. Supp. 2d 379, 384 (E.D. Pa. 2009) (applying this framework to Title III of ADA). The United States does not need to show the existence of a defendant's official policy or custom. *United States v. Town of Colo. City*, 935 F.3d 804, 810 (9th Cir. 2019).

The United States' burden to plead a pattern or practice of discrimination is not onerous. At the pleadings stage, a plaintiff does not need to state facts to establish a *prima facie* case of a pattern or practice. *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019). Instead, "a plaintiff need only provide 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (*quoting Twombly*, 550 U.S. at 570). Thus, to overcome a motion to dismiss in a pattern-or-practice case, the allegations only need to create a reasonable inference that a pattern or practice of discrimination exists. *See e.g.*, *United States v. Prashad*, 437 F. Supp. 3d 105, 108-09 (D. Mass. 2020); *EEOC v. Glob. Horizons, Inc.*, 904 F. Supp. 2d 1074, 1085 (D. Haw. 2012); *Nobel Learning Cmtys.*, 676 F. Supp. 2d at 384. Whether a pattern or practice exists is ordinarily a factual question for the jury and "each case must stand on its own facts." *United States v. Balistrieri*, 981 F.2d 916, 930 (7th Cir. 1992).

There is no minimum number of incidents or victims which the United States must allege or ultimately prove for a pattern or practice. *United States v. Garden Homes Mgmt., Corp.*, 156 F. Supp. 2d 413, 420 (D.N.J. 2001). Although "no mathematical formula is workable, nor was any intended," courts have found that discrimination against as few as two individuals was enough to establish a pattern or

practice claim. *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971). Instead, the "number of incidents necessary to show a pattern or practice depends on the nature of the right protected and the nature of the ordinary violations of such right." *United States v. Mintzes*, 304 F. Supp. 1305, 1314 (D. Md. 1969). In *Mintzes*, after a bench trial, the United States established a pattern or practice of discrimination based on three instances of the defendant making illegal representations to three different homeowners in violation of the Fair Housing Act. In an ADA pattern-or-practice case brought by the United States, a district court held that eleven instances of alleged discrimination throughout six preschools located in six states were enough to plead a pattern-or-practice claim. *Nobel Learning Cmtys.*, 676 F. Supp. 2d at 380, 384-85; *see also United States v. City of N.Y.*, 713 F. Supp. 300, 323 (S.D.N.Y. 2010) (observing "that the discrimination appeared to impact only four women [did] not diminish the Government's case" at trial); *Garden Homes Mgmt. Corp.*, 156 F. Supp. 2d at 420 (based on evidence of "at least five incidents of racial discrimination," denying summary judgment motion filed by operator of three apartment complexes).

As set forth below, the United States' Complaint contains well-pleaded facts creating a reasonable inference of widespread discrimination. The Court should reject Uber's attempts to diminish the scope and frequency of the alleged discrimination.

> **1.    The Complaint plausibly alleges that Uber is engaging in a pattern or practice of disability-based discrimination.**

Uber ignores the Complaint's well-pleaded facts and mischaracterizes the scope of Uber's alleged discrimination as mere isolated instances perpetrated by a "handful of drivers." Mot. to Dismiss at 10, *see also* Mot. to Dismiss at 11 ("anomalous instances"), Mot. to Dismiss at 12 (not "systemwide"), Mot. to Dismiss at 13 ("a tiny number of [] drivers"). Instead, the Complaint alleges more than sufficient facts to create a plausible inference that Uber is engaging in a pattern or practice of discrimination by failing to provide full and equal enjoyment of its transportation services to people with disabilities in violation of 42 U.S.C. § 12184. First, the Complaint alleges that Uber's discrimination affects hundreds, if not thousands, of individuals with disabilities who have experienced discrimination while attempting to use Uber's transportation services. Second, the Complaint highlights the experiences of seventeen exemplar individuals to illustrate the type and scope of the alleged discrimination. Third, the Complaint explains

how the frequent discrimination has caused aggrieved individuals to alter their lives to account for Uber's discrimination. Uber cannot meet its burden on a motion to dismiss by diminishing the scope of Uber's nationwide discrimination against people with disabilities.

The Complaint alleges that Uber denies service to "hundreds of individuals with disabilities who travel with service animals, who use wheelchairs or other mobility devices, or whose appearance or involuntary behavior because of their disabilities may offend, annoy, or inconvenience drivers." Compl. ¶ 47. This is a factual allegation, and not a legal conclusion, which the Court must accept as true in considering a motion to dismiss. The Complaint also alleges "Uber receives thousands of complaints each year alleging disability-based discrimination by Uber," creating a reasonable inference that Uber discriminates against much more than "hundreds" of individuals because of their disabilities. *Id*. ¶ 48. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("*Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where . . . the belief is based on factual information that makes the inference of culpability plausible.") (citation omitted). These factual allegations are sufficient to meet the plausibility standard required by *Iqbal* and *Twombly* and necessitate the denial of Uber's motion to dismiss the United States' pattern or practice claim.

But the Complaint goes further than required. In addition to the hundreds of individuals addressed above, it also includes factual allegations based on the experiences of seventeen riders with disabilities to support a reasonable inference that the discrimination alleged in the Complaint is not isolated instances perpetrated by a handful of Uber drivers. For example, Michael May, who lives in Nevada; Ryan Dour, who lives in California; Julie Tamez, who lives in Texas; Olivia Norman, who lives in Washington D.C.; Jeff Clark, who lives in New Jersey; Frank Coon, who lives Georgia; Ryan Honick, who lived in Virginia; and Kingsly Joseph, who lives in Connecticut, are *all* "frequently" or "routinely" denied rides because of their service animals or stowable wheelchairs. *See id*. ¶¶ 51, 65, 125, 164, 187, 216, 239, 247. The Complaint also provides specific examples of riders experiencing back-to-back ride denials from Uber drivers—sometimes experiencing three or four denials in a row. *See id*. ¶¶ 96-108 (Linda MacLeod); 126 (Julie Tamez); 136 (Valerie Hyatt); 174-181 (Teresa Speck); 189 (Ryan Honick); 237 (Jeff Clark); 248 (Frank Coon). And the Complaint alleges that Valerie Hyatt used Uber about nineteen times in October 2024 and was denied rides at least four of those times after the Uber driver learned she was traveling with

a service animal—or over twenty-one percent of the time.  *See id.* ¶ 145.  These facts also further support a reasonable inference of a pattern or practice of discrimination.  In contrast, it would be *implausible* that these eleven individuals—all living in different parts of the country—have experienced disability-based discrimination on more than one occasion and by multiple Uber drivers on the same day if the alleged discrimination was only carried out by a handful of Uber drivers, as Uber wants this Court to believe.

And the Complaint still alleges more facts.  Julie Tamez was not traveling with a service animal between May 2023 and April 2025, and during that time never had an Uber driver arrive at her pickup location and then deny her service.  *See id.* ¶ 130.  In contrast, she did travel with a service animal between April 2025 and September 2025 and experienced at least fifteen ride denials while attempting to use Uber because of her service animal.  *See id.* ¶ 131.  Ryan Honick has also experienced ride denials only while traveling with his service animals.  *See id.* ¶ 187 (Ryan Honick).

Finally, if there is still any doubt that Uber's discrimination is anything but isolated, the Complaint alleges the multiple ways people have altered their lives because Uber is an unreliable transportation option because of their disabilities.  For example, individuals avoid Uber when possible, even when it costs them more money.  *See id.* ¶¶ 65-66 (Ryan Dour), 92 (Mary Wilson), 160 (Jason Ludlow), 184 (Teresa Speck), 229 (Vincent Coleman).  Individuals budget additional time when relying on Uber in anticipation of being denied a ride.  *See id.* ¶¶ 67 (Ryan Dour), 146 (Valerie Hyatt), 243 (Jeff Clark), 246 (Frank Coon).  And other individuals will sometimes make the difficult choice to travel without their guide dog to avoid Uber's discrimination.  *See id.* ¶¶ 88, 90 (Mary Wilson), 184 (Teresa Speck), 195 (Ryan Honick), 242 (Jeff Clark), 264 (Kristen Ingalz).  If the alleged discrimination was truly isolated or sporadic, it is unlikely people would spend more money, waste their time, or sacrifice their safety to meet their transportation needs.

In sum, hundreds of people with disabilities, if not thousands, are subjected to discrimination while using Uber's transportation services and many are subjected to repeat instances of discrimination.  The seventeen individuals highlighted in the Complaint provide concrete examples of the alleged discrimination and the frequency of the discrimination experienced by them and similarly situated individuals across the United States.  Riders with disabilities have altered their behavior because of Uber's discrimination.  The well-pleaded facts in the Complaint are more than sufficient to permit this Court to

reasonably infer that that the instances of discrimination are not isolated and, instead, Uber is engaging in a pattern or practice of discrimination by failing to provide full and equal enjoyment of its transportation services to people with disabilities in violation of 42 U.S.C. § 12184.

### 2. Uber incorrectly asks the Court to require statistical evidence of discrimination.

Uber misstates the law when it argues, in a footnote, that "[absent] an express discriminatory policy . . . the government *must allege* statistically significant instances sufficient to infer that the alleged service denials are Uber's standard operating procedure." Mot. to Dismiss at 12 n.6 (emphasis added).[5] But statistical evidence is not required to prove, much less plead, a pattern or practice of discrimination. Instead, the Supreme Court clearly held that the usefulness of statistics in proving a pattern or practice "depends on all of the surrounding facts and circumstances." *Teamsters*, 431 U.S. at 340. And statistical evidence is never *required*. *City of N.Y.*, 713 F. Supp. 2d at 323. In *City of N.Y.*, the United States established a pattern or practice of employment discrimination without statistical evidence while basing its claim on four women who were not hired by the City. The United States instead relied on other evidence, including evidence of a discretionary hiring process, resulting in the Court holding that "[t]here were simply no mechanisms to ensure that persons tasked with hiring were employing permissible criteria in their selection of applicants." *Id.* at 318.

In the same footnote, Uber further attempts to diminish the extent of its discrimination against riders with disabilities by asking the Court to take judicial notice of how many rides Uber provides globally. Mot. to Dismiss at 12 n.6. As an initial matter, how many rides Uber provides globally (or even within the United States) is irrelevant to the United States' claim. What is relevant is the extent of the discrimination experienced while using Uber's services by people who travel with service animals, stowable wheelchairs, or who have other discrete types of disabilities that result in discrimination. As such, the United States' objects to Ubers' request to take judicial notice of this purported self-serving fact

---

[5] Uber cites to *United States v. Fitness Int'l, LLC*, No. 8:24-cv-02172-SVW-KES, 2025 WL 2093424, at *3, 5 (C.D. Cal. June 6, 2025) for this proposition. But *Fitness Int'l* does not support Uber's assertion. Instead, the Court in *Fitness Int'l* merely states the general proposition that "[a] plaintiff *can allege* a pattern or practice of discrimination . . . by sufficient instances of discrimination and anecdotal *or* statistical evidence from which a court can reasonably infer the existence of a discriminatory pattern or practice." *Fitness Int'l, LLC*, 2025 WL 2093424, at *3 (emphasis added).

because it is not relevant to the United States' claim. *Merritt v. Barclays PLC*, No. 2:23-CV-09217-MEMF-KS, 2025 WL 1906688, at *3 (C.D. Cal. July 10, 2025) (documents subject to judicial notice must be "central to the plaintiff's claim" to be considered on a motion to dismiss) (citations omitted).

Uber further attempts to rely on facts outside the four corners of the Complaint by asking the Court to take judicial notice of a report issued by the Bureau of Transportation Statistics for the proposition that "[r]oughly the same portion of those with disabilities use rideshare services compared to those without disabilities, and persons with disabilities who use rideshare services take a significantly larger number of trips than those without disabilities." Mot. to Dismiss at 9 n.6. Once again, it would be improper for the Court to consider any facts contained in this document because it is irrelevant, confuses the issues, and at best creates a dispute of fact not appropriate at the pleadings stage. *Corinthian Colls.*, 655 F.3d at 999. The report tells the Court nothing about the extent of discrimination faced by people with disabilities while using Uber. Even when statistical evidence is relevant, it is not appropriate to consider in support of a motion to dismiss because such evidence requires a factual inquiry and that would likely be rebutted, examined, and explained through discovery. *See Obrey v. Johnson,* 400 F.3d 691, 696 (9th Cir. 2005) (discussing weight and admissibility of statistical evidence).

Finally, the district court's analysis in *Fitness Int'l, LLC*, 2025 WL 2093424, regarding pattern-or-practice claims has limited value to the analysis here. The allegations in *Fitness Int'l* involved the physical accessibility of about 700 buildings throughout the United States. The court concluded that alleging instances of discrimination by only four aggrieved individuals and generalized allegations of ADA violations at a few LA Fitness locations in one city did not plausibly demonstrate a pattern or practice of discrimination. *Id.* at 3. In contrast, the court noted that the allegations in *Glob. Horizons, Inc.* were "far more robust." 860 F. Supp. 2d at *5. In *Glob. Horizons, Inc.*, the court denied a motion to dismiss where the EEOC's complaint alleged a foreign labor recruiter, in placing people to work on various farms, had subjected seven people and others similarly situated to employment discrimination without analysis as to the total number of laborers who were recruited. 860 F. Supp. 2d at 1081-1082, 1085. Here, the United States claims that Uber fails to provide full and equal access to its transportation services through evidence of a widespread pattern of discrimination based on similar experiences of people across the United States. As addressed in Section V(B)(i) above, the well-pleaded facts are more than sufficient to

1  create a reasonable inference of discrimination.  And like the evidence relied upon in establishing liability

2  in *City of N.Y.*, *supra*, the United States has also alleged facts to create a reasonable inference that Uber,

3  despite any written polices it has, has nevertheless failed to develop a mechanism to ensure that persons

4  tasked with providing its transportations service are complying with the ADA.

### 3.    The Court should view all factual allegations of unequal service together.

6        Uber also asks the Court to dismiss the United States' claim "with respect to certain theories" of

7  ADA violations.  Mot. to Dismiss at 10.  Such a limitation would be error.  The United States' Complaint

8  asserts one claim—an ADA violation—supported by detailed, well-pleaded facts.  The Complaint shows

9  various ways that Uber discriminates against riders with disabilities in violation of Title III of the ADA.

10  It would be improper to limit the United States' ability to ultimately prove a pattern or practice of

11  discrimination by adopting Uber's argument that the Court should not consider evidence of the many ways

12  Uber violates the ADA.

13        The ADA provides that "[n]o individual shall be discriminated against on the basis of disability in

14  the full and equal enjoyment of specified public transportation services provided by a private entity that

15  is primarily engaged in the business of transporting people and whose operations affect commerce."  42

16  U.S.C. § 12184(a).  Thus, the statute does not just prohibit ride denials but also prohibits the provision of

17  unequal service even when service is provided.  *C.f. Baughman v. Walt Disney World Co.*, 685 F.3d 1131,

18  1136 (9th Cir. 2012) ("if [Disney] can make [plaintiff's] experience less onerous and more akin to that

19  enjoyed by its able-bodied patrons, it must take reasonable steps to do so.").

20        The Complaint alleges that even when Uber does not outright deny service to individuals with

21  disabilities, it often discriminates against them in other ways.   Uber's drivers unlawfully impose

22  disability-related surcharges, including cleaning fees related to their service animals, refuse to reasonably

23  accommodate riders' disability-related needs, and in some instances speak to them in ways that are

24  insulting and demeaning and violate the ADA.  *See* Compl. ¶ 230.  All these allegations, coupled with the

25  allegations concerning ride denials, support a finding that Uber is engaging in a pattern or practice of

26  discrimination in violation of 42 U.S.C. § 12184(a).

27        Uber's provision of unequal transportation services is clearly illustrated through Frank Coon.  Uber

28  frequently denies rides to Mr. Coon because of his guide dog.  *See* Compl. ¶ 247.  But Mr. Coon has

experienced discrimination in other ways when using Uber.  For example, in 2024, an Uber driver initially refused to give Mr. Coon and his wife a ride home from a restaurant because of his service animal.  *See id.* ¶ 251.  The driver relented only after Mr. Coon, his wife, and other restaurant patrons informed the driver he would be violating the law if he refused.  *See id.* ¶ 252.  The driver did not speak or respond to Mr. Coon during the ride and drove by his house multiple times without dropping him off.  *See id.* ¶ 253.  Concerned about having to pay an inflated fare, Mr. Coon asked to be dropped off at a nearby grocery store and then walked home.  *See id.* ¶ 254.  After, the driver charged him a cleaning fee even though the driver knew Mr. Coon was traveling with a service animal.  *See id.* ¶ 255.  This is just one of many examples in the Complaint that shows how riders with disabilities experience unequal service.  *See id.* ¶¶ 52, 60, 82, 141, 168, 209, 219 (having to confront and persuade Uber drivers to provide service), ¶¶ 67, 146, 197 (adding time to itinerary to account for possible ride denials), ¶¶ 118, 169, 192 (charging illegal fees); ¶ 129 (asked to muzzle guide dog or place guide dog in trunk).  Such evidence of Uber's discrimination is fair game for this Court's consideration of the well-pleaded facts alleging a pattern or practice of Uber's ADA violations.

### 4.    Charging a cancellation fee or cleaning fee because of a person's disability violates the ADA.

Uber also argues that its practice of charging certain fees to passengers with disabilities does not violate the ADA.  And, once again, Uber seeks to impose a higher burden of pleading than Rule 8 requires.  Uber ignores that these are prohibited "special charges" and "higher fares or fees."  Uber incorrectly asserts that refunding these fees only upon request absolves Uber of its discriminatory acts.  Uber's argument wrongly ascribes responsibility for charging the fees solely to Uber drivers.

First, DOT's ADA regulation requires that Uber "shall not impose special charges, not authorized by [Part 37], on individuals with disabilities . . . for providing services required by [Part 37] or otherwise necessary to accommodate them."  49 C.F.R. § 37.5(d).  This means Uber is prohibited from charging a person with a service animal a cleaning fee following a routine trip.  Such a fee is not authorized by 28 C.F.R. § 36.302(c)(8) (incorporated by 49 C.F.R. § 37.5(f)), which only permits charges for *damage* caused by a service animal, not regular shedding.  Uber's reliance on *Disabled in Action of PA. v. Nat'l Passenger R.R. Corp.*, 418 F. Supp. 2d 652 (E.D. Pa. 2005), is unavailing.  Uber describes the case as

"rejecting [an] ADA claim challenging fees that were consistent with specifically applicable DOT rules[.]" Mot. to Dismiss at 14.  Here, however, the United States alleges that Uber's policy is inconsistent with DOT's specifically applicable rules, because Uber imposes impermissible surcharges when it charges cleaning fees related to service animals.  Compl. ¶ 6, 49 C.F.R. §§ 37.5(d), 37.29(c).

Uber also may not "discriminate against individuals with disabilities by actions including, but not limited to, refusing to provide service to individuals with disabilities who can use taxi vehicles, refusing to assist with the stowing of mobility devices, and charging higher fares or fees for carrying individuals with disabilities and their equipment than are charged to other persons." 49 C.F.R. § 37.29.  When an Uber driver denies a ride because a passenger is traveling with a service animal, Uber discriminates.  Then charging that passenger a cancellation fee even though it was the Uber driver, and not the passenger, who refused service, is further discrimination based on disability.  And if a second Uber driver later arrives and provides service, but then Uber charges the passenger a cleaning fee because the passenger is traveling with a service animal, this is yet another act of discrimination in violation of the ADA.  That passengers without disabilities can be charged a cancellation fee or cleaning fee is irrelevant.  Here, the allegation is that these fees are charged *because* of a person's disability.  Those charges are prohibited. *E.g.* Compl. ¶¶ 169, 192.

Second, Uber alleges that because Uber may ultimately refund the illegal charges Uber absolves its ADA violation.  Not so.  The regulations prohibit the imposition of special charges. *See* 49 C.F.R. § 37.5(d).  Even if some charges are eventually refunded, the violation has already occurred.  And when a person is illegally charged a fee, the burden is placed on the rider with a disability to dispute the charge. This takes time and effort to do so. *E.g.* Compl. ¶ 197.  Similarly, Uber attempts to evade its ADA obligation by saying the alleged discriminatory fees are triggered by and paid to its drivers, and not Uber, and therefore Uber has no liability.  But the Complaint alleges that Uber controls whether these fees may be charged and is obligated "to independently review and verify that its drivers have not improperly charged riders additional fees or surcharges" based on disability. *See* Compl. ¶¶ 34, 278.  Despite being on notice Uber drivers are illegally charging passengers with disabilities, Uber has failed to modify its practice as required by the ADA and ADA's implementing regulations.  Uber argues that the United States' reasonable modifications claim should be dismissed.  Mot. to Dismiss at 20-21.  However, Uber's

arguments misconstrue the statute and disregard the facts stated in the Complaint, which demonstrate that Uber fails to reasonably modify both its policy and practice of assessing fees and of limiting credits to passengers once they have reached a certain cap.

> ### 5. Uber maintains an affirmative obligation to comply with training and complaint procedure regulations.

The Complaint alleges a pattern or practice of discrimination caused, in part, by Uber's failure to comply with two specific obligations imposed on it by regulation: first, to take affirmative steps to ensure its drivers are trained to proficiency, and second, to adopt an adequate complaint process.

First, each private entity "which operates a . . . demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities." 49 C.F.R. § 37.173; *see Lowell v. Lyft, Inc*., No. 17-cv-06251 (PMH), 2024 WL 4350159, at *30 (S.D.N.Y. Sep. 30, 2024) (holding Lyft would be required to have mechanisms in place for driver training before it offered wheelchair accessible vehicles in a region). Whether a company has trained its personnel to proficiency is generally a question of fact. One district court, in denying summary judgment to the defendant, found a material issue of fact existed when the defendant provided training on service dogs, but it was not proven that the training was successful given evidence that bus operators did not understand the entity's own rules on service animals. *Stamm v. N.Y.C. Transit Auth*., No. 04-CV-2163 SLT JMA, 2011 WL 1315935, at *29 (E.D.N.Y. Mar. 30, 2011). And in *James v. Peter Pan Transit Mgmt., Inc*., No. 5:97-CV-747, 1999 WL 735173, at *6-7 (E.D.N.C. Jan. 20, 1999), the district court held, in denying the transportation company's motion for summary judgment, there was an issue of fact for trial based on evidence that tended to show drivers were not trained to proficiently operate wheelchair lifts and that the drivers did not follow company policy.

Here, the Complaint more than sufficiently alleges that Uber drivers fail to follow the ADA and Uber's policies, creating a reasonable inference that Uber has failed to train its drivers to proficiency.[6]

---

[6] Uber boldly asks the Court to take judicial notice of a 2020 negotiated settlement agreement between the United States' Attorney's Office for the Central District of California and Lyft as purported evidence of what standard of training is required under the ADA. *See* Mot. to Dismiss at 17 n.9. The Court should

Further, the Complaint alleges multiple instances which reasonably infer that Uber drivers do not know, or are confused by, Uber's written policies regarding ADA obligations. For example, Uber drivers have told riders traveling with service animals that they should take Uber Pet, even though a service animal is not a pet. *See* Compl. ¶¶ 59 (Michael May), 105 (Linda MacLeod), 166 (Olivia Norman). Other Uber drivers have insisted they are not obligated by the law or Uber's policy to accept service dogs. *See id.* ¶ 140. Other Uber drivers have demanded the "dog's papers," which individuals who use service dogs are not required to provide. *See id.* ¶ 177; 28 C.F.R. § 35.136(f). For example, Uber drivers have incorrectly told Kingsley Joseph that they are not allowed to assist with stowing his wheelchair. *See* Compl. ¶ 218. And, as addressed above, Uber drivers impose illegal surcharges on riders. These facts, along with the frequency of alleged discrimination, plausibly allege that Uber has not trained its drivers to proficiency.

Similarly, Uber must adopt "complaint procedures that provide for the prompt and equitable resolution of complaints alleging disability discrimination, including prompt communication of the entity's response and reasoning for its response to each complaint." 49 C.F.R. § 37.17(b). Whether Uber complies with this mandate is a factual issue that cannot be decided before discovery. However, the Complaint alleges sufficient facts to plausibly allege Uber does not comply with this affirmative obligation. For example, the Complaint alleges that Michael May has filed numerous complaints with Uber regarding Uber's ride denials and he has not been told the results of Uber's investigations. *See* Compl. ¶ 63. Similarly, Uber has refused to tell Ryan Dour the result of any investigation into complaints he filed with Uber. *See id.* ¶ 73. The Complaint further alleges that "many riders with disabilities do not bother filing complaints against Uber each time they are discriminated against because they so rarely get a meaningful response and have not experienced an improvement in service." *Id.* ¶ 281. These factual allegations permit a plausible inference that Uber violates this regulatory requirement.

And whether Uber provides an "equitable resolution" of complaints is also a factual dispute not appropriate to address at the pleadings stage. Thus, while Uber's written policy states that its drivers "may lose their ability to use the Driver App" if found to discriminate, it is not Uber's written policy to always

---

reject Uber's request. Not only is it wholly inappropriate to rely on a settlement agreement as evidence of what a federal regulation requires in a civil case, *see* Fed. R. Evid. 408, but Uber also asks the Court to assume that Uber trains its drivers to proficiency which directly contradicts allegations in the Complaint.

take this disciplinary action. *See id.* ¶¶ 95-109 (after being denied a ride by three Uber drivers in a row, and filing a complaint with Uber, all three drivers continued to drive for Uber). And whether a $5 or $15 credit for discrimination to the passenger is "equitable" is also a factual dispute for a jury to determine. *See id.* ¶¶ 143 ($5 credit for complaint of unequal service), 159 ($15 credit for ride denial resulting in missing a flight home).

### C. Uber Is Not Only Directly Liable Under The ADA But Is Also Vicariously Liable For Its Drivers' Actions.

The United States brings its ADA claim not just pursuant to the Attorney General's authority to bring pattern or practice claims, but also under the Attorney General's authority to bring ADA claims that raise an issue of "general public importance." 42 U.S.C. § 12188(b)(1)(B)(ii). Thus, even if the Court were to find that hundreds of individuals experiencing discrimination while using Uber's transportation services is somehow insufficient to infer a pattern or practice of discrimination, the Court should not dismiss the Complaint, because hundreds of individuals experiencing discrimination while using Uber's transportation services is nevertheless a matter of general public importance as determined by the Attorney General. As acknowledged by Uber, this determination is unreviewable. *See* MTD 22.; *Fitness Int'l*, 2025 WL 2093424 at *3, 5; *United States v. Taigen & Sons, Inc.*, 303 F. Supp. 2d 1129, 1133 (D. Idaho 2003); *United States v. Northside Realty Assocs.*, 474 F.2d 1164, 1168 (5th Cir. 1973) and 501 F.2d 181, 182 (5th Cir. 1974) (per curiam); *United States v. City of Philadelphia.*, 838 F. Supp. 223, 227 (E.D. Pa. 1993), *aff'd*, 30 F.3d 1488 (3d Cir. 1994); *United States v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276, 1291 n.9 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987).

While Uber acknowledges the United States' authority to proceed on all claims believed by the Attorney General to be a matter of general public importance, Uber also argues that absent direct liability, Uber cannot be held indirectly responsible for any "isolated" instances of discrimination carried out by its drivers. Uber is incorrect. While the Complaint clearly alleges facts to support Uber's direct liability, even assuming *arguendo* that the United States might be required to proceed under a vicarious liability theory, it can do so. The well-pleaded allegations in the Complaint show that when an Uber driver accepts a ride on the Uber app and then cancels a ride because of the rider's disability, the Uber driver is acting as

1    an agent for Uber and Uber is vicariously liable whether or not the act of discrimination was expressly

2    authorized by Uber or attributable to Uber's failure to prevent.

3         As Uber admits, vicarious liability generally applies to federal civil rights statutes.  Indeed, where

4    Congress has not addressed the question of vicarious liability directly with respect to a particular federal

5    cause of action, it is a core principle of agency law that "[a] master is subject to liability for the torts of

6    his servants committed while acting in the scope of their employment," as well as for torts committed

7    outside the scope of employment where the servant "is aided in accomplishing the tort by the existence of

8    the agency relation."  Restatement (Second) of Agency § 219(1) and (2)(d) (1958); *see also* Black's Law

9    Dictionary (12th ed. 2024) (explaining the concept of "scope of employment" includes "[t]he range of

10   reasonable and foreseeable activities that an employee engages in while carrying out the employer's

11   business"); Restatement (Second) of Agency § 229 (1958) (noting that conduct may be within the scope

12   of employment if it is "incidental to the conduct authorized").  Similarly, "[a] principal is subject to

13   vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or

14   purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute

15   the tort or enable the agent to conceal its commission."  Restatement (Third) of Agency § 7.08 (2006).[7]

16        In a similar context, the Supreme Court has held that vicarious liability applies to claims arising

17   under Title VII of the Civil Rights Act and the Fair Housing Act.  *See Burlington Indus. v. Ellerth*, 524

18   U.S. 742, 746 (1998) (Title VII); *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (Fair Housing Act).  And the

19   Ninth Circuit has held that vicarious liability applies to claims under the Rehabilitation Act and Title II of

20   the ADA.  *Bonner v. Lewis* 857 F.2d 559, 567 (9th Cir. 1988) (Rehabilitation Act in prison context), *Duvall*

21   *v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001), as amended on denial of rehearing (Oct. 11, 2001)

22   (Rehabilitation Act and Title II of the ADA).  When applying general principles of federal common law,

23   the application should be consistent with the policy of the federal statute.  *See, e.g.*, *Duvall*, 260 F.3d at

24   1141 (vicarious liability consistent with policy of Title II of the Rehabilitation Act).

25

26

27   [7] *Vance v. Ball State Univ.*, 570 U.S. 421, 428 n.2 (2013) (recognizing the "aided in" basis for vicarious
      lability found in the Second Restatement of Agency is now covered in the "apparent authority" basis for
28   liability found in the Third Restatement of Agency).

1    Whether a principal has sufficient control over an agent for vicarious liability purposes requires a

2    fact-specific analysis.  "Agency is the fiduciary relation which results from the manifestation of consent

3    by one person to another that the other shall act on his behalf and subject to his control, and consent by

4    the other so to act."  Restatement (Second) of Agency § 1 (1958).  The "control need not be total" and

5    vicarious liability may arise "even when 'the principal lacks the right to control the full range of the

6    agency's activities.'"  *Husayn v. Mitchell*, 142 F.4th 667, 676 (9th Cir. 2025) (citing Restatement (Third)

7    of Agency § 1.01 cmt. c (2006)); *see also Cleveland v. Caplaw Enterprises*., 448 F.3d 518, 522 (2d Cir.

8    2006) (control asserted "need not 'include control at every moment'" and "where the principal is

9    physically absent, may be ineffective").  Here, the Complaint plausibly alleges that Uber exerts control

10   over its drivers sufficient to establish its vicarious liability for Uber drivers' discriminatory actions, such

11   that dismissal on this ground would be improper.  Uber operates a transportation system that connects

12   drivers with riders.  Compl. ¶ 31.  Uber controls each trip by, among other things, setting driver vehicle

13   and training requirements; setting the price for each trip; setting polices for when fees may be charged;

14   and requiring its drivers to accept Uber's community guidelines.  *See id*. ¶¶ 31-43.  As one court found,

15   "Uber's drivers are part of the Uber workforce, and they operate within a market that Uber itself created;

16   Uber drivers do not exist independent of Uber's app.  *Equal Rts. Ctr.*, 525 F. Supp. 3d at 84-85.

17   Moreover, an entity can be vicariously liable even for intentional torts and even if the entity has

18   not authorized the employee to perform the tortious activity.  *Burlington Indus.*, 524 U.S. at 756-58 ("[T]he

19   concept of scope of employment has not always been construed to require a motive to serve the employer"

20   and "[s]cope of employment does not define the only basis for employer liability under agency

21   principles"); *see also* Restatement (Second) of Agency § 230 (1958) ("An act, although forbidden, or done

22   in a forbidden manner, may be within the scope of employment.").  In *Meyer*, the Supreme Court held that

23   a real estate company is vicariously liable for discrimination carried out by its salesperson under the Fair

24   Housing Act.  537 U.S at 285 (2003).[8]  Indeed, Fair Housing Act violations by agents authorized to make

25

26   [8] Title III of the ADA and its implementing regulation support the conclusion that the general rule of
     vicarious liability applies.  *C.f. Bonner*, 857 F.2d 559 at 567 (finding respondent superior is applicable to

27   claims under § 504 of the Rehabilitation Act, adopting district court's conclusion that application of
     respondeat superior would be entirely consistent with the policy of the statute to eliminate discrimination

28   against people with disabilities).  The ADA clearly mandates that "*[n]o individual* shall be discriminated
     against on the basis of disability in the full and equal enjoyment of specified public transportation services

housing decisions on behalf of owners have been held to fall squarely within the scope of their agency—even without showing that the owner authorized or benefited from the discrimination. *See Doe v. Sterling*, No. 2:23-CV-10061-RAO, 2025 WL 3724625, at *3 (C.D. Cal. Dec. 19, 2025) ("The relevant question is whether the agency relationship facilitated the unlawful conduct."); *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1092-93 (E.D. Cal. 2016) ("Where a property manager violates fair housing requirements, the property owner is vicariously liable for those violations."); *Caplaw Enterprises*, 448 F.3d 518, 522 (owner of property held vicariously liable for leasing agent's discriminatory refusal to rent an apartment). As such, just as the owner of a property is vicariously liable for the discriminatory actions of an agent hired to lease an apartment under the Fair Housing Act, so too is Uber vicariously liable for the discriminatory actions of its drivers when its driver has accepted an Uber rider's request for a ride and then later cancels for discriminatory reasons.

As such, even though the Complaint alleges sufficient fact to plausibly infer Uber's pattern or practice of discrimination, and even though the Complaint alleges sufficient facts to plausibly allege that Uber, itself, fails to prevent discrimination sufficient to hold it liable under the ADA, the Complaint also alleges sufficient facts to plausibly allege that Uber is also indirectly liable for its drivers' actions under the ADA.

## VI.   **CONCLUSION**

For these reasons, the United States respectfully requests that the Court deny Uber's Motion. If the Court does not deny the Motion, the United States respectfully requests that the Court grant leave to amend the Complaint. *See* Fed. R. Civ. P. 15(a)(2); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*) ("[A] district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." (citation omitted)).

---

*provided* by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184 (emphasis added).

1       Respectfully submitted this 6th day of February, 2026

2

3

4  CRAIG H. MISSAKIAN            HARMEET K. DHILLON
    United States Attorney              Assistant Attorney General

5  Northern District of California       Civil Rights Division

6                               R. JONAS A. GEISSLER
                               Deputy Assistant Attorney General

7      /s/ Michael A. Keough         Civil Rights Division
    MICHAEL A. KEOUGH

8  Assistant United States Attorney
                               /s/ Jane E. Andersen

9                               KEVIN J. KIJEWSKI
                               Deputy Chief

10                             JANE E. ANDERSEN
                             KATHERINE DUTCHER

11                            DAVID W. KNIGHT
                             Trial Attorneys

12                            Disability Rights Section
                             Civil Rights Division

13                            U.S. Department of Justice